[No. E020383. Fourth Dist., Div. Two. Aug. 10, 1999.]

DONALD G. WEBBER, Plaintiff and Appellant, v.
INLAND EMPIRE INVESTMENTS, INC., et al., Defendants and
Appellants.

[No. E021506. Fourth Dist., Div. Two. Aug. 10, 1999.]

DONALD G. WEBBER, Plaintiff and Appellant, v.
INLAND EMPIRE INVESTMENTS, INC., et al., Defendants and
Respondents.

COUNSEL

Reid & Hellyer, Donald F. Powell and Michael G. Kerbs for Plaintiff and Appellant.

Waldron & Olson, Gary A. Waldron and John S. Olson for Defendants and Appellants and for Defendants and Respondents.

OPINION

**HOLLENHORST, J.**—This case was submitted to the jury on a seventh cause of action alleging that defendants conspired to intentionally interfere with a contractual relationship. Agreeing with plaintiff, Donald G. Webber, the jury returned a special verdict in his favor.

The subsequent judgment awarded plaintiff Webber the sum of $1,254,946 in general damages against defendants Inland Empire Investments, Inc. (Inland), James P. Previti and Forecast Corporation, plus $50,000 in punitive damages against defendant Inland, and $50,000 in punitive damages against defendant Forecast Corporation, plus interest. Four other defendants were found not liable and were awarded their costs.

Defendants Inland, James P. Previti and Forecast Corporation appealed the judgment which was entered on the special verdict on April 16, 1997.[1]

Plaintiff Webber then filed a cross-appeal from the "portion of [the] judgment which incorporates the order granting summary judgment of defendants as to the sixth cause of action . . . on a promissory note . . . ."

---

[1]The judgment was amended nunc pro tunc on October 14, 1997, to include a statement of decision, to request an election of remedy, and to specify that specified defendants were entitled to recover their attorney fees and costs from plaintiff Webber in the amounts stated below.

In consolidated case No. E021506, plaintiff Webber filed an appeal from an order granting attorney fees to defendants in the sum of $15,429.69 as to Forecast Mortgage Corporation and the sum of $67,638.12 as to the remaining defendants. By order filed January 9, 1998, we ordered the appeals consolidated for decision.

## FACTS

In September 1989, Hyatt Land Development Corporation sold four parcels of real property located near Hemet to defendant Forecast Mortgage Corporation for $4,554,000. As part of the financing for the transaction, Forecast Mortgage executed a note for $754,000 in favor of Hyatt. The note was secured by a deed of trust on one of the four parcels. Plaintiff Webber is the assignee of both the Hyatt note and the deed of trust.

Another part of the financing for the transaction involved a loan from Sanwa Bank to defendant Forecast Mortgage in the sum of $3,653,650, and the payment of that sum to Hyatt as part of the purchase price. As security for the loan, Forecast Mortgage gave Sanwa Bank a deed of trust on all four parcels of property. The Sanwa deed of trust was recorded before the Hyatt deed of trust and it was therefore senior to the Hyatt deed of trust on parcel No. 4.

On February 15, 1990, title to the property was transferred from Forecast Mortgage to Forecast Corporation and on September 2, 1992, title was transferred to All Cities Mini-Storage. Forecast Mortgage subsequently failed to make any payments on the Hyatt note, which had been assigned to plaintiff Webber. On April 10, 1992, Mr. Webber commenced foreclosure proceedings.

Although the parties stipulated that defendant Forecast Mortgage Corporation had the financial ability to pay off the Hyatt note in August 1992, it decided not to do so. Instead, Forecast's owner, Mr. Previti, decided to (1) transfer title to the property from Forecast Corporation to another corporation he controlled, All Cities Mini-Storage; (2) use another corporation he controlled, Inland, to purchase the note from Sanwa Bank; (3) have Forecast Mortgage default on the note, and (4) then have Inland foreclose on the property, thus eliminating Mr. Webber's junior security on parcel No. 4. The trial court characterized these transactions as a "sham foreclosure."

Following this course of action, Inland bought the note from Sanwa, and the note and deed of trust were assigned to Inland. Mr. Webber decided not to pursue his foreclosure action, and Inland then proceeded with its own

foreclosure action against All Cities, purchasing the property at a foreclosure sale in January 1993.[2] Due to the foreclosure of the senior lien, Mr. Webber's junior lien was extinguished. The end result was that Mr. Webber lost his junior lien in the sum of $754,000 plus interest. This suit followed.

ISSUES

On May 17, 1994, Mr. Webber filed his third amended complaint against Mr. Previti, Inland and a number of other entities. These appeals concern three causes of action stated in the third amended complaint: (1) the first cause of action for declaratory relief; (2) the sixth cause of action for sums due on a purchase money note; and (3) the seventh cause of action for conspiracy to intentionally interfere with a contractual relationship.

1. *The First Cause of Action.*

The declaratory relief cause of action alleged that the doctrine of after-acquired title applied to the transaction by which Inland acquired title to parcel No. 4 because Inland was the alter ego of Forecast Mortgage and the other defendants. Mr. Webber sought a declaration that his note and deed of trust remained a valid encumbrance on parcel No. 4.

The trial court tried the declaratory relief cause of action and decided it by considering the evidence presented to the jury on the seventh cause of action. The trial court decided the declaratory relief cause of action in plaintiff Webber's favor, applied the after-acquired title doctrine, and ordered that the Hyatt Land Development Corporation trust deed be reattached to the subject property as a valid lien against parcel No. 4.

The trial court also found that Mr. Previti "dominated and controlled each of these entities and made the final determination as to the acts taken by these entities." It therefore applied the alter ego doctrine, finding that Inland was dominated and controlled by Mr. Previti, and that Inland acted as the alter ego of Forecast Mortgage in taking the actions described above.

However, the trial court also ordered plaintiff Webber to elect his remedy, i.e., plaintiff had to decide whether to accept the lien against the property or accept the jury's monetary award on the seventh cause of action. Not surprisingly, plaintiff elected to accept the jury's decision.

---

[2]We take judicial notice of our own prior unpublished decision in *Webber* v. *Sanwa Bank California* (Oct. 22, 1997) E017560. In that decision, we affirmed the trial court's granting of summary judgment to Sanwa, finding that it was legally justified in pursuing repayment of its loan to Forecast by selling the note to Inland rather than foreclosing on it. We also found that there was no evidence that Sanwa participated in a conspiracy to deprive Mr. Webber of his rights under the Hyatt note.

## 2. The Sixth Cause of Action.

The sixth cause of action was based on the Hyatt promissory note. It alleged that the subject purchase transaction was not a standard purchase transaction, and that plaintiff Webber was therefore entitled to recover a deficiency judgment against Forecast Mortgage. On September 27, 1994, the trial court granted a motion for summary adjudication on this cause of action, thus finding that plaintiff was not entitled to a deficiency judgment.

As a result of the trial court's finding in favor of defendants on the sixth cause of action, the judgment included a provision that Mr. Webber take nothing on his complaint against defendants All Cities Mini-Storage, The James Previti Family Trust, Forecast Development, and Forecast Homes of Northern California, and also provided that those entities should recover their costs and attorney fees from Mr. Webber, in the sum of $67,638.12. On a separate motion, Forecast Mortgage was also granted attorney fees in the sum of $15,429.69.

These provisions of the judgment are the subject of Mr. Webber's cross-appeal. On the cross-appeal, Mr. Webber contends that the trial court erred in applying the antideficiency rules to this transaction. On his direct appeal in case No. E021506, he presents the same arguments, since a reversal on the merits would also cause a reversal of the attorney fee award.

## 3. The Seventh Cause of Action.

The seventh cause of action is for conspiracy to intentionally interfere with a contractual relationship. It is directed against all defendants except Forecast Mortgage and Riverside National Bank.[3]

The cause of action alleges that defendants knew of the contractual relationship between Forecast Mortgage and Mr. Webber, i.e., the Hyatt promissory note and trust deed, that Mr. Previti and Sanwa agreed to the transaction set forth above, and that defendants conspired to eliminate Mr. Webber's rights and interest under the note and deed of trust.

The complaint then alleges specific roles played in the conspiracy by Inland, Forecast Mortgage, Forecast Corporation, Mr. Previti, and Sanwa.

[3]The cause of action thus includes a conspiracy allegation against Sanwa Bank. In our earlier opinion, we upheld a summary judgment in favor of Sanwa, finding no evidence that Sanwa had conspired with Mr. Previti to destroy Mr. Webber's interest in the Hyatt note. Thus, Sanwa Bank cannot be considered a coconspirator for purposes of the seventh cause of action.

We also noted that Forecast Mortgage was a party to the contract, and it cannot be held liable for interference with its own contractual relationship. Accordingly, Forecast Mortgage was expressly and intentionally excluded as a named defendant in the seventh cause of action.

With regard to defendants The Previti Trust, Forecast Development, Forecast Corporation, and Forecast Homes, the cause of action alleges that they "aided and assisted the remaining co-conspirators by providing releases and indemnification agreements to SANWA to induce it to participate in the conspiracy."

As noted above, a jury trial ensued and the jury rendered a special verdict on the allegations of the seventh cause of action. By its special verdict, the jury found (1) two or more defendants participated in a conspiracy to breach the contractual relationship between plaintiff and Forecast Mortgage Corporation; (2) seven defendants knew of the existence of the agreement between plaintiff and Forecast Mortgage Corporation; (3) four of the defendants engaged in acts intended to cause a breach of the contract between plaintiff and Forecast Mortgage Corporation, and three defendants did not; (4) four of the defendants engaged in conduct which did cause a breach of the contract, and three did not; (5) the contract would have been performed by Forecast Mortgage except for the acts of the four defendants; (6) plaintiff was damaged as a result in the sum of $1,254,946; (7) three of the four defendants that caused the breach (Inland, Mr. Previti, and Forecast Corporation) were not justified in doing so, while the fourth (All Cities Mini-Storage) was justified. Other findings were made to support the punitive damage allegations. Subsequently, the jury awarded Mr. Webber punitive damages of $50,000 each against defendants Inland and Forecast Corporation. No further punitive damages were assessed against Mr. Previti individually.

4. *The Alter Ego Issues.*

Confusion has arisen over the alter ego allegations and findings. The third amended complaint alleges in its general allegations that defendants Inland, Forecast Corporation, Forecast Mortgage Corporation, Forecast Development, Forecast Homes of Northern California, and All Cities Mini-Storage are each alter egos of each other, and were each owned, operated and controlled by Mr. Previti.

At trial, Mr. Previti testified that he owned all of the stock of Forecast Mortgage Corporation at the time of the transaction. He was majority owner, president and chief executive officer of Forecast Corporation, and made the final decisions for the other Forecast companies. Mr. Previti was also the president of Inland and owned half of the stock of that corporation. He also owned all of the stock of All Cities Mini-Storage.

Accordingly, in its decision on the first cause of action, the trial court found that Mr. Previti was the owner of all or at least half of the stock of

Forecast Mortgage, Forecast Corporation, Inland, All Cities Mini-Storage, Forecast Development, and Forecast Homes of Northern California. It therefore found that Inland, as dominated and controlled by Mr. Previti, was acting as the alter ego of Forecast Mortgage in the subject transactions. As the court put it, "[Mr. Previti is] both the individual center point of this circle of corporations and he is also the agent of each of them in doing all of these acts. So I don't know how you can come to any other conclusion but that they're all the alter ego of the others." Since Forecast Mortgage, acting through its alter ego, All Cities Mini-Storage, reacquired the property, the trial court found that the after-acquired title doctrine applied.[4]

Notwithstanding the trial court's alter ego decision on the first cause of action, it permitted the plaintiff to proceed on a conspiracy theory on the seventh cause of action despite the obvious fact that, if there was really only one defendant, Mr. Previti and his wholly owned corporations, there were no independent coconspirators.

As a result of the trial court's decision to allow plaintiff to proceed on a conspiracy theory, no alter ego instructions were given to the jury. Instead, the trial court permitted an amendment to the seventh cause of action to delete the alter ego allegations which had been incorporated by reference into the seventh cause of action. It then gave conspiracy instructions to the jury.

Based on the foregoing, defendants raise three alter ego issues for determination. Referring to the jury's special findings on the seventh cause of action, defendants contend that they were entitled to judgment as a matter of law because (1) a party, in this case Forecast Mortgage, could not be held liable for conspiring to interfere with its own contract; (2) in effect, the Previti entities were all one entity, and the entity could not conspire with itself; and (3) Mr. Previti, as the officer and controlling person of each of the companies, could not be liable for conspiring with the companies he controls.

## SEVENTH CAUSE OF ACTION: CONSPIRACY TO INTERFERE WITH CONTRACT

### A. *Application of the Alter Ego Doctrine*

■ Defendants first argue that a party cannot be held liable for interfering with its own contract. They rely on *Applied Equipment Corp.* v. *Litton*

---

[4]In our opinion filed on October 22, 1997, we noted that the junior lienholder could persuasively argue that the senior lien was extinguished by merger because an alter ego of the owner purchased the senior trust deed. However, we expressly declined to decide whether a merger had occurred.

*Saudi Arabia Ltd.* (1994) 7 Cal.4th 503 [28 Cal.Rptr.2d 475, 869 P.2d 454]. In that case, our Supreme Court held that a contracting party cannot be held liable in tort for conspiracy to interfere with its own contract. The court said: "California recognizes a cause of action against *noncontracting parties* who interfere with the performance of a contract. 'It has long been held that *a stranger to a contract* may be liable in tort for intentionally interfering with the performance of the contract.' [Citation.] [¶] However, consistent with its underlying policy of protecting the expectations of contracting parties against frustration *by outsiders* who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a contract does not lie against a party to the contract. [Citations.] [¶] . . . The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." (*Id.,* at pp. 513-514, fn. omitted, italics in original.)

Application of this doctrine in this case depends on the definition of the term "party to the contract." Defendants point out that the trial court found, in its decision on the first cause of action, that Mr. Previti made all of the decisions for each of the defendants. As a result, they contend that the controlled entities were not strangers to the contract. They cite *Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 262 [45 Cal.Rptr.2d 90], which quotes *Applied Equipment* and then states: " 'It is obvious that if an action is brought for interference with contractual relationship by one party to a contract against another who is also a party to that same contract, the grievance of the plaintiff is, in essence, breach of contract; and, in such case, plaintiff is entitled to recover all damages flowing from the breach. In such an instance to allow the plaintiff to sue under the tort theory of wrongful interference with contractual rights would not only be superfluous, but also would enable him to recover tort damages (e.g., punitive damages, damages for mental suffering) to which he is not entitled under California law.' [Citations.]" (*Kasparian, supra,* at p. 262, italics omitted.)

It is apparent that, if the defendants are to be treated as one because they are all owned and controlled by Mr. Previti, the doctrine that a party cannot interfere with its own contract would apply, and there could be no conspiracy to interfere with the contract because there would not be separate parties to the conspiracy. The issue thus becomes whether, as defendants urge, judgment should be entered for defendants as a matter of law. In other words, defendants contend that the actions taken were orchestrated by Mr. Previti to protect his own economic interests in connection with a contract made by his own corporation.

Mr. Webber relies on *Shapoff* v. *Scull* (1990) 222 Cal.App.3d 1457 [272 Cal.Rptr. 480] (disapproved in part in *Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th 503, 521, fn. 10). In *Applied Equipment*, our Supreme Court disapproved *Shapoff* and other cases "to the extent they hold that a party to a contract can be held liable in tort based on a conspiracy to interfere with its own contract . . . ." (7 Cal.4th at p. 521, fn. 10.) Nevertheless, Mr. Webber contends that *Shapoff* remains good law and is dispositive on the alter ego issue.

In *Shapoff*, two individuals, Scull and Boomis, were found to be the alter egos of SERJ, the development corporation, prior to submission of the issue to the jury. The jury found that SERJ had breached a development agreement as a result of the tortious interference by Boomis. On a new trial motion, defendants argued that the alter ego finding precluded Boomis's tort liability on the interference with contract claim. The trial court then allowed plaintiff to elect between his claims against Boomis, and it deleted the alter ego finding from the judgment. (*Shapoff* v. *Scull, supra,* 222 Cal.App.3d 1457, 1461-1462.) On appeal, defendants argued that the trial court erred in deleting the alter ego finding, and contended that the alter ego finding barred the tort claim as a matter of law.

The appellate court discussed the evidence and then erroneously held that a party to a contract could be liable in tort for its breach. (222 Cal.App.3d at pp. 1464-1466.) This portion of the opinion is no longer authority in light of the subsequent *Applied Equipment* decision. The court then discussed the potential liability of an owner, manager, or adviser of a business, noting that the cases have "consistently found owners, managers and advisers may be held liable in tort as third parties where they were not acting to protect the interest of the contracting party." (*Shapoff* v. *Scull, supra*, 222 Cal.App.3d 1457, 1466.)

However, with regard to alter ego liability, the court found that liability does not depend upon whether the owner or manager was acting in the interest of a contracting party. (*Shapoff* v. *Scull, supra*, 222 Cal.App.3d 1457, 1469.) ▮ It cited two requirements for application of the alter ego doctrine: (1) a unity of interest and ownership such that the separate personalities of the corporation and the individual no longer exist, and (2) that an inequitable result will follow if the acts are treated as those of the corporation alone. (*Id.,* at pp. 1469-1470.) Finally, it noted that disregard of the corporate entity is in no sense automatic. (*Id.,* at p. 1470.) "Thus it is plain that contrary to the defendants' argument on appeal, abuse of the corporate privilege by itself does not require that a court disregard the separate identity of a corporation. There must be some equitable purpose which will be served

by ignoring the corporate form." (*Id.*, at p. 1471.) The court therefore found that "the trial court's alter ego finding did not prevent the jury from finding Boomis liable for tortious interference with contract, nor did it prevent the trial court from entering judgment on the jury's verdict." (*Id.*, at p. 1473.)

We agree with Mr. Webber that *Shapoff* is indistinguishable from this case, and its subsequent partial disapproval in *Applied Equipment* does not prevent application of its other principles here. Although, at first glance, the trial court's alter ego finding here appears to be inconsistent with the jury's finding that separate corporations conspired to interfere with the contract between Forecast Mortgage and Mr. Webber, we find no fatal inconsistency. In effect, the trial court allowed plaintiff to proceed on an alter ego theory as to the first cause of action, and an alternative conspiracy theory on the seventh cause of action. When some defendants lost on both causes of action, the trial court ordered plaintiff to elect his remedy.

The trial court's determination is consistent with general principles for application of alter ego liability. The doctrine is an equitable one, based on Civil Code section 3528: "The law respects form less than substance." The doctrine has been well stated in the recent case of *Communist Party* v. *522 Valencia, Inc.* (1995) 35 Cal.App.4th 980 [41 Cal.Rptr.2d 618]: "Ordinarily, a corporation is regarded as a legal entity separate and distinct from its stockholders, officers and directors. Under the alter ego doctrine, however, where a corporation is used by an individual or individuals, or by another corporation, to perpetrate fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, a court may disregard the corporate entity and treat the corporation's acts as if they were done by the persons actually controlling the corporation. [Citations.] [¶] In general, the two requirements for applying the alter ego doctrine are that (1) there is such a unity of interest and ownership between the corporation and the individual or organization controlling it that their separate personalities no longer exist, and (2) failure to disregard the corporate entity would sanction a fraud or promote injustice. [Citations.] The doctrine is applicable where some innocent party attacks the corporate form as an injury to that party's interests. The issue is not so much whether the corporate entity should be disregarded for all purposes or whether its very purpose was to defraud the innocent party, as it is whether in the particular case presented, justice and equity can best be accomplished and fraud and unfairness defeated by disregarding the distinct entity of the corporate form. [Citations.] [¶] Nevertheless, persons who themselves control a corporation, who have used the corporate form of doing business for their benefit, who have dealt with and treated the corporation as a separate entity, or who have otherwise by their actions expressly or impliedly recognized its corporate existence, may be estopped to deny the

corporation's separate legal existence. [Citations.] 'Parties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges. The *alter ego* doctrine is applied to avoid inequitable results not to eliminate the consequences of corporate operations. [Citations.]' [Citation.] Thus, alter ego is used to prevent a corporation from using its statutory separate corporate form as a shield from liability only where to recognize its corporate status would defeat the rights and equities of third parties; it is not a doctrine that allows the persons who actually control the corporation to disregard the corporate form." (*Id.,* at pp. 993-994.) In other words, " 'Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person. [Citation.]' [Citation.]" (*Id.,* at p. 995.)

 Here, defendants are seeking to apply the alter ego doctrine as a sword to preclude liability or, as Mr. Webber puts it, a shield to protect them from conduct which would otherwise be tortious, even though defendants sought to use the separate corporations to eliminate plaintiff's junior lien through foreclosure. The trial court may well have thought that disregard of the corporate entity in this case would lead to an inequitable result, i.e., the rule that a contracting party cannot be liable for interfering with its own contract would become applicable. It therefore presumably found that the second requisite for application of the doctrine was not present; i.e., it did not find that failure to disregard the corporate entity would sanction a fraud or promote injustice. Since the court has considerable equitable discretion, we cannot say that it erred in failing to instruct the jury that the entities were all one entity. This is true even though the first requirement for application of the doctrine, a unity of ownership and interest, was clearly met.

We therefore conclude that since defendant's premise that there was necessarily only one defendant, Mr. Previti and his alter ego corporations, fails, the conclusion that there could be no conspiracy as a matter of law must also fail. Since the trial court was entitled to, and did, instruct the jury on conspiracy liability, the jury was authorized to find that at least two of the corporations conspired with each other to engage in a sham foreclosure to eliminate Mr. Webber's junior lien.

### B. *Actions of Inland*

 Defendants next contend that Inland's acquisition of the note did not interfere with Mr. Webber's contract, and that Inland's foreclosure on the note did not constitute tortious interference with the contract because, in each instance, Inland was only doing what it was legally entitled to do.

■ Defendants add that the conspiracy allegations add nothing to the equation because "Standing alone, a conspiracy does no harm and engenders no tort liability. It must be activated by the commission of an actual tort. ' "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." ' [Citations.]" (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd., supra,* 7 Cal.4th 503, 511.)

■ While we agree with the premises, the fact remains that the issue of whether the defendants acted in concert pursuant to a scheme to wrongfully eliminate Mr. Webber's junior lien was submitted to the jury and the jury found, on substantial evidence, that the allegations were true as to three of the defendants. Thus, the jury determined that the acts constituting interference with the existing contract were taken, and that the tort was therefore committed. Since substantial evidence supports the jury's determination, we must accept it. In other words, the jury had defendants' justification defense before it, and it rejected the defense.

As defendants note, the justification issue also arose in the context of Sanwa's summary judgment motion, arising from the naming of Sanwa in the seventh cause of action. The trial court held in that context that Sanwa's desire to receive payment of its note was sufficient legal justification for the interference with plaintiff's note with Forecast Mortgage. We affirmed, noting that "[a]s a creditor, Sanwa was entitled to take all legal steps to obtain payment of the debt owed to it, even if the result was that Forecast would default on its obligation to the other creditor, Mr. Webber." Thus, after Inland purchased the note, it had the same rights as Sanwa to attempt to collect on it. However, that right did not extend to participation in a sham foreclosure designed for the specific purpose of eliminating the junior lien. As the trial court found, the purchase of the note and the foreclosure were not legitimate business transactions, but rather were structured as a foreclosure solely to defeat the junior lien.

In other words, Inland's right to collect on the note did not extend to intentional acts designed to disrupt the contractual relationship embodied in the junior lien. There being sufficient evidence of the conspiracy to wrongfully eliminate the junior lien, the jury's finding that there was such a conspiracy must be upheld.

### C. *The Protection Afforded by Antideficiency Legislation*

■ Defendants also contend that the effect of the jury's decision was to allow a recovery of tort damages from them in violation of the policies

underlying the antideficiency statute, Code of Civil Procedure section 580b. They point out that plaintiff elected not to pursue his remedy, foreclosure on the property, before Inland foreclosed. They argue that to allow a tort claim in these circumstances would undercut the policy underlying the antideficiency prohibition of Code of Civil Procedure section 580b and the security first rule of Code of Civil Procedure section 726.

Defendants again cite *Applied Equipment*, which states that conspiracy is not an independent tort, but rather a theory which "allows tort recovery only against a party who already owes the duty and is not immune from liability based on applicable substantive tort law principles." (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th 503, 514.)

Recognizing that their argument depends upon application of the alter ego doctrine, defendants argue that the doctrine is available as an affirmative defense. They cite cases in which a guarantor is sued for a deficiency and attempts to defend by demonstrating that he or she was actually a principal obligor on the loan. (E.g., *Torrey Pines Bank* v. *Hoffman* (1991) 231 Cal.App.3d 308 [282 Cal.Rptr. 354] [individuals were alter egos of their family trust]; see generally, Bernhardt, Cal. Mortgage and Deed of Trust Practice 2d (Cont.Ed.Bar 1990) § 8.18, pp. 412-413; *id.*, (Cont.Ed.Bar Supp. 1999) pp. 191-193.)

While we agree with defendants that an alter ego defense is available to establish that guarantors were actually principal obligors, the fact remains that defendants here relied on a justification defense and did not seek to present an alter ego defense to the jury. Thus, the trial court ruled that "alter ego relationship is not a factor to be determined by the jury in connection with the justification defense."

In any event, we agree with Mr. Webber's more general proposition that the antideficiency statute does not prevent pursuit of a tort claim: "[T]he antideficiency statutes embrace a complete legislative scheme for foreclosure for defaulted debts. It has long been recognized, however, that those statutes do not preclude a suit for fraud. [Citations.] [¶] Section 725a specifically refers to recovery on a 'debt' while section 580d specifically refers to judgments on a deficiency on a 'note.' There is, therefore, nothing in the express language of the statutes which precludes an action not involving recovery on a debt or note. [Citations.] A suit for fraud obviously does not involve an attempt to recover on a debt or note. As such, it stands separate and apart from any action which the antideficiency legislation seeks to preclude. [¶] Neither the purpose nor intent of the antideficiency statutes is frustrated by allowing a creditor to recover damages for fraud in the

inducement of a loan." (*Guild Mortgage Co.* v. *Heller* (1987) 193 Cal.App.3d 1505, 1511-1512 [239 Cal.Rptr. 59].)

Mr. Webber also cites *Manson* v. *Reed* (1986) 186 Cal.App.3d 1493 [231 Cal.Rptr. 446], in which the court also held that fraud was an exception to the antideficiency law: "It would be wrong to apply a bar of recovery against plaintiff based upon a statute relating to a transaction that was fraudulently induced. To do so would be to condone the fraud. The law cannot condone such a result and it doesn't. Therefore, if there is substantial evidence to support the trial court's findings of fraud, the antideficiency statute will not prevent the judgment from standing." (*Id.,* at p. 1502, fn. omitted.)

### D. *Alleged Lack of Causation and Lack of Damages*

■■■ Defendants next contend that the plaintiff failed to establish the proximate cause and damages elements of the cause of action. ■■ Defendants rely on *Orloff* v. *Metropolitan Trust Co.* (1941) 17 Cal.2d 484 [110 P.2d 396]: "To state a cause of action for conspiracy, facts must be alleged showing the formation and operation of a conspiracy and damage resulting from an act or acts done in furtherance of the plan. As the cause of action is for the damage suffered, and not the mere conspiracy, the complaint must state facts which show that a civil wrong was done resulting in damage." (*Id.,* at p. 488.) As the quote indicates, the *Orloff* case is a pleading case, and the issue was the sufficiency of the allegations as against a general demurrer. Nevertheless, we agree with the basic principle that causation and damages must be shown. (*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, supra, 7 Cal.4th 503, 511.)

■■■ The essence of defendants' claim is that there was no equity in the property to support a junior lien and that the lien was therefore valueless. This is essentially an argument that there was no substantial evidence to support the jury's award of $1,254,946 in damages.

Mr. Webber finds substantial evidence in the stipulation that Forecast Mortgage had the financial ability to pay off the first trust deed, and the Hyatt note, in August 1992. If Forecast Mortgage had done so, Mr. Webber's lien would have become the only lien on parcel No. 4. Instead, Mr. Previti adopted a sham foreclosure scheme by using the same amount of money to purchase the note and first trust deed from Sanwa, and then using his related companies to default on the note and to foreclose on the property, thus eliminating the junior lien.

We find that there is sufficient evidence from which the jury could have concluded that there was a sham foreclosure scheme which had the effect of

depriving Mr. Webber of his security interest in parcel No. 4. While the value evidence is less clear, we find that the causation and damages issues were properly submitted to the jury, the jury specifically found both causation and damages, and that the jury's award is supported by substantial evidence.

## E. *Alleged Instructional Errors*

### 1. *Refusal to Give Defendants' Proposed Special Instructions Nos. 7 and 14.*

Defendants' proposed special instruction No. 7 is a statement of Inland's right to foreclose to enforce the note it purchased from Sanwa. The proposed instruction stated: "If you find that Inland Empire Investments had the right to purchase the Sanwa Note, then Plaintiff and Inland Empire Investments both had contracts with Forecast Mortgage Corporation. If you find that Inland Empire Investments conduct was lawful and undertaken to enforce its rights under such contract with Forecast Mortgage Corporation, then you must find in favor of Defendants even if you find that conduct caused Forecast Mortgage Corporation to breach its contract with Plaintiff."

Defendants' proposed special instruction No. 14 states: "Trustor or affiliate of trustor may purchase and take assignment of a deed of trust and exercise the right to foreclose thereunder; in so doing, he acts 'in a perfectly legal and proper way,' even though such foreclosure defeats another party's contractual rights and interest in the property."

The first instruction was derived from California Forms of Jury Instruction (1999) Interference With Economic Relations, section 41.17[1], page 41-43. Both instructions relate to defendants' justification defense. The trial court refused to give these two instructions because it thought that the defendants were attempting to isolate the component parts of the transaction to show that each part was proper. It felt that the pleadings did not authorize defendants to approach the issue in this manner, although it did permit argument to that effect. Since the trial court thought that plaintiff could force defendants to view the transaction as a whole, rather than breaking the transaction into its component parts, it refused to give these instructions.

Defendants rely on *Imperial Ice Co.* v. *Rossier* (1941) 18 Cal.2d 33 [112 P.2d 631], which states: "[I]f two parties have separate contracts with a third, each may resort to any legitimate means at his disposal to secure performance of his contract even though the necessary result will be to cause a breach of the other contract." (*Id.,* at p. 37.)

In our earlier opinion, we discussed the justification defense set forth in *Rossier*, and we agreed that Sanwa was entitled to take all legal steps to obtain payment of the debt owed to it, even if the result was that Forecast would default on its obligations to the other creditors. (*Webber* v. *Sanwa Bank, supra,* E017560.) We agree with defendants that a bona fide purchaser of the note and deed of trust from Sanwa was equally entitled to take steps to obtain payment. Thus, the proposed instruction No. 7 was a correct statement of the law.

Similarly, we do not disagree with defendants' contention that the proposed special instruction No. 14 was also a correct statement of the law. (*Sanders* v. *Magill* (1937) 9 Cal.2d 145 [70 P.2d 159].) Nevertheless, the focus of the plaintiff's cause of action was that Mr. Previti and the corporations had entered into a conspiracy to interfere with the contract by conducting a sham foreclosure. While the individual actions or overt acts taken by the coconspirators might be legal or illegal, the conspiracy encompassed the entire course of conduct of defendants, i.e., the concocting of a sham foreclosure to interfere with the contract and to eliminate the rights of the junior lienor, not the individual acts themselves.[5] Thus, the trial court apparently felt that the proposed instructions overly emphasized the legality of the individual acts while disregarding the overall thrust of the plaintiff's cause of action. We cannot say that it abused its discretion in declining to give the defendants' proposed special instructions No. 7 and 14.

Even if the trial court erred, we would find the error nonprejudicial. The jury was instructed on defendants' justification defense as set forth in Restatement Second of Torts section 767 and the defendants argued justification to the jury. The trial court's refusal to give the requested additional instructions on justification was therefore not a prejudicial error.

2. *Refusal to Give Defendants' Proposed Special Instructions Nos. 9 and 13.*

Defendants' proposed special instruction No. 9 states: "An owner of an entity is privileged to interfere with the entity's contract with a third

---

[5]In *Webber* v. *Sanwa Bank,* we also discussed specific cases which hold that modifications of a senior lien may require the consent of the junior lienholder when they prejudice the rights of the junior lienholder. (*Lennar Northeast Partners* v. *Buice* (1996) 49 Cal.App.4th 1576 [57 Cal.Rptr.2d 435]; *Gluskin* v. *Atlantic Savings & Loan Assn.* (1973) 32 Cal.App.3d 307 [108 Cal.Rptr. 318].) As *Gluskin* states: "[T]his is not to say that a lender and a buyer can enter into an agreement or a course of conduct between themselves whose result is to destroy a seller's interest. Such an agreement or conduct if deliberately undertaken would entitle the seller, depending upon the facts of the case, to secure relief either upon the ground of fraud or pursuant to the requirement of fair dealing inherent in all contracts in general . . . ." (*Id.,* at p. 315.)

party where the predominant purpose of such interference is to protect the entity's interests."

Proposed special instruction No. 13 states: "Agents of a corporation cannot be held personally liable for conspiring with their corporate principal when they act in their official capacity on behalf of the corporation and not as individuals for their individual advantage."

The trial court refused to give the first proposed instruction because, although it agreed with the principle, it felt that the language should be incorporated in the general justification instruction. Accordingly, as one of the justification factors, the jury was told that it could consider: "Whether the acts were taken in good faith and by proper means by an owner or manager of defendants for the predominant purpose of advancing the financial interests of those defendants . . . ."

The trial court refused to give the second proposed instruction because it thought that the instruction could only apply to Mr. Previti, and it would be impractical to ask the jury to determine when Mr. Previti was acting for himself and when he was acting as the agent of another corporation. Although it offered to consider the question again if additional authority was submitted, no further authority was submitted.

Defendants now contend that the trial court's ruling precluded them from relying on the privilege of Mr. Previti, as owner of the corporations, to act to protect the interests of the entities he owned and the privilege of Mr. Previti to act in his official capacity on behalf of the corporations without incurring individual liability.

Defendants cite *Wanland* v. *Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507 [281 Cal.Rptr. 890], which states: "Ownership and control of an entity do not by themselves relieve a defendant from tort liability for interfering with the entity's contracts. [Citations.] Rather, the tort liability of an owner, director, or manager depends on whether he or she was acting to protect the interests of the entity. [Citation.] Thus, the owner of an entity enjoys a qualified privilege to terminate a contract to which the entity is a party, provided that the owner's predominate purpose in inducing the breach is to further the entity's interests. [Citation.] And a manager likewise enjoys a qualified privilege to induce the entity to breach a contract that he or she reasonably believes to be harmful to the entity's best interests." (*Id.,* at p. 1522.)

Defendants point out that proposed special instruction No. 9 was based on Restatement Second of Torts section 769, while the proposed

special instruction No. 13 was based on the Comment to BAJI No. 13.85 (8th ed. 1999 pocket pt.) page 83. Again, we do not disagree with defendants' contention that the proposed instructions were an accurate statement of the law. However, as quoted above, the substance of the first instruction was given as part of special instruction No. 6.

As to proposed special instruction No. 13, it was not clearly applicable to the facts here. As Mr. Webber points out, the so-called manager's privilege is a qualified one, and it does not apply to actions taken by Mr. Previti to further his own interests. The trial court may well have thought that the evidence showed only that Mr. Previti was acting in his own interests, not the interests of his controlled corporations. If so, the qualified privilege would not apply. As the court stated in *Wanland*: "A manager need not be acting solely in his or her employer's interests in order to claim the privilege; all that is required is proof that the employer's interest was one of the factors motivating his or her conduct or advice." (*Wanland* v. *Los Gatos Lodge, Inc.*, *supra*, 230 Cal.App.3d 1507, 1522.) After all, there was certainly no benefit to Inland, Forecast Corporation, or All Cities in getting involved in the sham foreclosure action.[6] The evidence only showed that Mr. Previti used those entities, which he controlled, to accomplish the scheme of invalidating the junior lien on parcel No. 4. Thus, we find no error in failing to give proposed special instructions Nos. 9 and 13.

### 3. *Refusal to Give Defendants' Proposed Special Instruction No. 10.*

■ Defendants' proposed special instruction No. 10 states: "An alter ego of an entity is privileged to interfere with the entity's contract with a third party where the predominant purpose of such interference is to protect the entity's interests."

As discussed above, it was proper for the trial court to refuse to give an instruction on this subject because the alter ego issue had already been excluded from this cause of action. As also discussed above, defendants relied on a justification defense, not an alter ego defense. The instruction would have required the jury to speculate whether a party was or was not an alter ego, without any definitional guidance. As noted above, the alter ego defense is an equitable one and is not a matter for jury decision. The trial court properly declined to give this instruction.

### 4. *Refusal to Give Defendants' Proposed Special Instruction No. 20.*

■ Defendants proposed special instruction No. 20 states: "A purchaser of real property, by signing a promissory note secured by a deed of

---

[6]The business of Inland was to operate an insurance company which provided homeowner's insurance for people who purchased homes from the Forecast home building entity.

trust, does not make an absolute promise to pay the entire obligation, but makes only a conditional promise to pay any deficiency that remains if a judicial sale of the encumbered property does not satisfy the debt. [¶] Where the purchaser gives a deed of trust to the seller of the property to secure payment of a promissory note for the balance of the purchase price of that real property, the purchaser is not obligated to pay any deficiency that remains if a judicial sale of the encumbered property does not satisfy the debt."

This instruction was not submitted until after the initial instructions had been given, and after initial oral argument. The trial court commented: "This isn't an exactly correct statement of the law on this subject, and since both sides are going to be arguing as to whether or not there should have been a payment, whether there was an obligation to pay, and plaintiff is in effect arguing there's an absolute obligation to pay that note, and that is not the law with this type of contractual relationship, and for that reason I'll—I will include it in the rejected packet indicating that it was submitted too late."

Although defendants contend that the instruction should have been given because it was a correct statement of the law, they fail to explain why the instruction was not submitted in a timely manner. Even if the instruction is a correct statement of the law, it does not necessarily have to be given. Since a late instruction would have unduly emphasized its contents, we find no basis for concluding that the trial court erred in refusing to give the proffered instruction.

### F. *Alleged Improper Exclusion of Evidence*

Defendants next contend that the trial court erred in failing to admit into evidence a letter dated August 14, 1992, from defendants' in-house counsel to a Sanwa Bank vice-president. The letter sets forth a request for a loan from Sanwa to enable Forecast to purchase the Sanwa note and foreclose it. The letter also states: "Jim [Previti] was initially concerned that junior creditor might be in some way equitably, morally or legally disadvantaged by the proposed transaction. My answer to him was a simple 'no.' The junior creditor's sole remedies will not be changed or prejudiced in any way."

The trial court refused to allow admission of the letter into evidence, contending that it expressed an incorrect legal conclusion, and that it would mislead the jury to put that legal conclusion in front of them. It did allow Mr. Previti to testify that his actions were taken in reliance on advice of counsel and, perhaps for this reason, no punitive damages were assessed

against him. Subsequently, the trial court explained: "First, [the letter] is not and does not purport to be advice to [Mr. Previti]. It's a letter trying to persuade Sanwa to take a particular action. [¶] Second, it deals not only with the priority of deeds of trust . . . but with what essentially is the ultimate issue in this case which is the lawfulness of the conduct. . . . I think those are the kinds of legal conclusions that are what are prohibited." The trial court went on to exclude the letter on Evidence Code section 352 grounds. The court also stated that, at the time of the letter, Mr. Previti had already decided what he was going to do. The trial court subsequently approved the statement of Mr. Webber's counsel that the letter was inadmissible because it contained inadmissible opinion testimony by an expert, and because it was argumentative and self-serving.

Defendants now contend that the trial court erred because the letter correctly stated the law and because it should at least have been admitted to show Mr. Previti's state of mind.

The letter did not correctly state the law, because, as discussed in part H, a senior creditor cannot deliberately undertake a course of action designed to eliminate a seller's purchase money interest. The letter was therefore properly excluded because it could confuse the jury on the applicable law. Even if we assume that the letter was relevant to the issue of Mr. Previti's state of mind, the trial court has broad discretion to exclude otherwise relevant evidence under Evidence Code section 352. In view of the other problems with the letter, and specifically the possibility of misleading the jury by exposing the jurors to incorrect and argumentative legal conclusions, we cannot say that the trial court abused its broad discretion under Evidence Code section 352 in excluding the letter from evidence.

### G. *Alleged Error in Failing to Find Specific Coconspirators*

Defendants next argue that the trial court erred in overruling their objection to the form of the special verdict. Specifically, they point out that they asked the trial court to amend the special verdict form to specify which defendants it found participated in the conspiracy.

The trial court refused to do so. It said: "I think it's unnecessary to ask about each of them because the unquestioned evidence is that if any . . . two of them engaged in a conspiracy, then they all did through Mr. Previti who controls all of them. That's the uncontested evidence, so you don't need a list." The trial court thus confused the conspiracy and alter ego issues, and failed to recognize that, if Mr. Previti was the alter ego of all the corporations, there could be no coconspirators. In other words, the trial court treated

the "seventh cause of action as alleging in effect if you don't buy the alter ego theory, then the relationship among these separate entities was a conspiracy. And the unlawful act, that is, the tort was the tort of this, of them to interfere with the contractual relationship of All Cities with the holder of the note."

The special verdict form therefore asked the jury to first answer the question: "Did any two or more of the defendants participate in a conspiracy to breach the contractual relationship or to disrupt the contractual relationship between plaintiff and Forecast Mortgage Corporation?" Subsequent questions asked the jury to determine, for each defendant, which defendants knew of the existence of the agreement, and which defendants engaged in acts or conduct which was intended to cause a breach of the agreement.

The jurors decided that all defendants knew of the existence of the agreement, but that only four defendants, Inland, All Cities, Forecast Corporation and Mr. Previti, had engaged in acts intended to cause a breach of the agreement. These parties, except All Cities, are the entities against whom the award was made in the judgment. We find no lack of clarity in the special verdict or the judgment in this respect because the conspiring parties are specifically identified. We therefore disagree with defendants' contention that the conspiring defendants cannot be identified from the special verdict.

### H. Evidentiary Support for Punitive Damages Award

Turning to the punitive damages award of $50,000 against Inland and $50,000 against Forecast Corporation, defendants first argue that the award must be overturned because they are entitled to judgment or a new trial on the seventh cause of action. We disagree with and reject the proposition for the reasons stated above.

Defendants also argue that the evidence is insufficient to support the punitive damages award because it does not support a finding that they acted with oppression or malice. While they restate their version of the facts and urge that their actions actually improved plaintiff's position from a second position to a first position, we again disagree.

Under plaintiff's theory of the case, defendants had the money to pay off the Sanwa note on schedule. Instead, defendants purchased the note for the same amount and then engaged in a sham foreclosure transaction, the sole purpose of which was to deprive Mr. Webber of the security afforded by the junior lien. We have above mentioned the cases which caution senior

lienholders from deliberately undertaking a course of conduct intended to wipe out the junior lienholder's security interest. (*Lennar Northeast Partners v. Buice, supra,* 49 Cal.App.4th 1576; *Gluskin v. Atlantic Savings & Loan Assn., supra,* 32 Cal.App.3d 307, 315.) As *Gluskin* states: "[T]his is not to say that a lender and a buyer can enter into an agreement or a course of conduct between themselves whose result is to destroy a seller's interest. Such an agreement or conduct if deliberately undertaken would entitle the seller, depending upon the facts of the case, to secure relief either upon the ground of fraud or pursuant to the requirement of fair dealing inherent in all contracts in general . . . ." (*Id.,* at p. 315.) Here, there was ample evidence of a scheme to wipe out the junior lienholder, and that evidence supports the tort judgment against some of the defendants. The tort having been established, the same evidence supports a punitive damages award under Civil Code section 3294.

### Sixth Cause of Action: to Recover on a Purchase Money Note

As noted above, Mr. Webber's cross-appeal concerns the trial court's granting of summary adjudication on the sixth cause of action on grounds that the antideficiency statute barred it. Since the trial court's attorney fee decision in favor of defendants was based on its decision on the sixth cause of action, the cross-appeal seeks to establish that the decision on the sixth cause of action was wrong, thus eliminating the basis for the attorney fee award.

### A. Facts

The sixth cause of action was based on the theory that plaintiff could recover a deficiency judgment against Forecast Mortgage because the Hyatt note was not the result of a standard purchase money transaction. The third amended complaint attached as exhibit A a release and subordination supplement to the deed of trust. The supplement provides that the lien of the deed of trust will be subordinate to "a senior loan made to Trustor for the acquisition of the Subject Property and/or the construction of offsite improvements to the Subject Property . . . ."

On June 22, 1994, defendants filed a motion for summary judgment which asked the trial court to grant summary adjudication of the sixth cause of action on grounds that the purchase was a standard purchase money transaction and that plaintiff was therefore not entitled to recover a deficiency judgment against Forecast Mortgage.

In their points and authorities, defendants conceded that *Spangler v. Memel* (1972) 7 Cal.3d 603 [102 Cal.Rptr. 807, 498 P.2d 1055] stands for

the proposition that a junior creditor who holds a purchase money note may sue on the note and recover a deficiency judgment when the second lien is subordinated to a senior deed of trust securing a construction loan. Citing *Budget Realty, Inc.* v. *Hunter* (1984) 157 Cal.App.3d 511 [204 Cal.Rptr. 48], defendants argued that the Hyatt note did not qualify as a nonstandard purchase money transaction because a construction loan never issued, and neither Hyatt nor Mr. Webber ever subordinated to a construction loan. Defendants argued that *Budget* governed because in that case, as in this, "the junior trust deed contained a subordination clause for construction financing, but the buyer never obtained construction financing and thus the subordination provision was never exercised." (Emphasis omitted.)

In response, Mr. Webber argued that *Spangler* governed, and that the antideficiency rules should not be applied in a situation in which the purchaser intends to develop the property. He also relied on *Wright* v. *Johnston* (1988) 206 Cal.App.3d 333 [253 Cal.Rptr. 418], and *Bell* v. *Roy* (1986) 187 Cal.App.3d 694 [232 Cal.Rptr. 83]. Thus, Mr. Webber argued that the transaction was a nonstandard purchase money transaction.

On September 27, 1994, the trial court ruled on the summary judgment motion. On the sixth cause of action, it ruled that the transaction was a standard purchase money transaction. It therefore granted defendants' motion for summary adjudication of the sixth cause of action in defendants' favor.

## B. *The Legal Issue: Was This a "Standard" Transaction?*

The primary legal issue on the cross-appeal is whether the antideficiency rule of Code of Civil Procedure section 580b should bar recovery by the sold-out junior lienor. Relying on *Spangler*, Mr. Webber contends that he should be able to recover a deficiency because the transaction was not a standard purchase money transaction.

In *Spangler*, the seller sought to enforce personal guarantees of the purchase price while the buyers sought to invoke the antideficiency bar. The court first reaffirmed its holding in *Brown* v. *Jensen* (1953) 41 Cal.2d 193 [259 P.2d 425] "that section 580b by its language applies to sold-out junior lienors holding a purchase money mortgage or deed of trust." (*Spangler* v. *Memel, supra*, 7 Cal.3d 603, 610-611.) The court then considered the effect of its decision in *Roseleaf Corp.* v. *Chierighino* (1963) 59 Cal.2d 35 [27 Cal.Rptr. 873, 378 P.2d 97] on *Brown.* It said: "We assumed [in *Roseleaf*] without argument or question that section 580b applied by its terms to sold-out junior lienors. Nevertheless we concluded that section 580b automatically applied only to the standard purchase money transaction and that

with respect to variants from this standard purchase money transaction, section 580b would apply only if the factual circumstances came within the purposes of the section. 'Section 580b was apparently drafted in contemplation of the standard purchase money mortgage transaction, in which the vendor of real property retains an interest in the land sold to secure payment of part of the purchase price. Variations on the standard are subject to 580b only if they come within the purpose of that section.' (*Roseleaf Corp.* v. *Chierighino, supra,* 59 Cal.2d 35, 41.)" (*Spangler* v. *Memel, supra,* 7 Cal.3d 603, 610, fn. omitted.)

Applying this principle, the court found that "a sale of real property for commercial development in which the vendor agrees to subordinate his senior lien under the purchase money deed of trust to the liens of lenders of the construction money for the commercial development is a variation on the standard purchase money mortgage transaction." (*Spangler* v. *Memel, supra,* 7 Cal.3d 603, 611.) Thus, in a subordination situation, there is no automatic application of Code of Civil Procedure section 580b. Accordingly, in such a situation, an analysis of the factual situation in the light of the purposes of the section is required. (7 Cal.3d at pp. 611-612.) After that analysis, the court concluded that "the purchaser not the vendor [should] bear the risk of failure, particularly since in the event of default, the junior lienor vendor will lose both the land and the purchase price." (*Id.,* at p. 613.) Accordingly, ". . . when in the sale of real property for commercial development, the vendor pursuant to the agreement of sale, subordinates his purchase money lien to the lien securing the purchaser-developer's construction loan and thereafter, upon the default of the purchaser-developer, loses his security interest after sale or foreclosure under the senior lien, section 580b should not be applied to bar recovery by the junior vendor lienor of the unpaid balance of the purchase price of the property." (*Id.,* at p. 614, fn. omitted.)

Mr. Webber also relies on *Wright* v. *Johnston, supra,* 206 Cal.App.3d 333. In that case, the court followed *Spangler* and allowed a deficiency judgment. Referring to *Budget Realty, Inc.* v. *Hunter, supra,* 157 Cal.App.3d 511, a case relied on by defendants here, the *Wright* court said: ". . . the court [in *Budget Realty*] examined the additional jeopardy a purchase money security is exposed to, focusing on the substance of the subordination agreement. There, where no actual subordination occurred, the court held the seller's mere agreement to do so had no effect on the transaction. Similarly, it noted it would be absurd to find a transaction where the dollar amount of a subordination is minimal to be a 'varietal' of *Spangler* significance. It is clear, however, that it is the substantiality of the nonpurchase money lien to which the seller subordinates in proportion to the value of the security it encumbers, that determines whether the transaction is so nonstandard that it places the buyer/borrower outside section 580b." (*Wright, supra,* at p. 338.)

The court also noted that its decision did not conflict with *Roffinella* v. *Sherinian* (1986) 179 Cal.App.3d 230 [224 Cal.Rptr. 502], which "holds that section 580b does not apply where a postsale construction loan subordination is negotiated pursuant to an agreement to do so contained in escrow instructions." (*Wright* v. *Johnston, supra,* 206 Cal.App.3d 333, 338.)

 Although we agree with Mr. Webber that the transaction here was a nonstandard transaction, as defined in *Spangler,* because it involved a subordination situation, that determination only requires us to examine the factual setting in light of the purposes of the antideficiency rule. Where the subordination is only for purchase-money financing, and the subordination clause was never actually used because construction financing was never obtained, Code of Civil Procedure section 580b is applicable.

We agree with defendants that the closest case factually is *Budget Realty, Inc.* v. *Hunter, supra,* 157 Cal.App.3d 511. In that case, the court said: "The sole issue on appeal is whether a purchase money trust deed is taken outside the antideficiency protection of Code of Civil Procedure section 580b when the trust deed contains an unexercised agreement to subordinate the security to a construction loan. We find that until the subordination provision is exercised, jeopardy to the seller's security has not been aggravated. Thus, we hold that presence of an unexercised subordination provision does not take a purchase money loan outside section 580b protection." (*Budget Realty, Inc., supra,* at p. 512, fn. omitted.) In that case, the buyer defaulted on a senior purchase money lien and the first trust deed holder foreclosed, extinguishing the junior lien. The seller sued the buyer to recover a personal judgment, and the buyer asserted the antideficiency bar. After an extensive discussion of *Spangler,* the court upheld the defense, noting that "in the circumstances of this case, additional risk to the security is effected on exercise of the subordination clause and not by mere presence of the clause." (*Id.,* at p. 517.)

The same is true here. The Hyatt note and the Sanwa note were both part of the purchase financing. The Hyatt note and the agreement to subordinate provide that the Hyatt note would be junior to the Sanwa note, and that it would also be subordinated to the anticipated construction financing.[7] However, no construction financing was ever obtained, and thus there was no actual subordination to a construction loan. There was thus no additional risk

---

[7]The exact language of the subordination agreement is as follows: "Provided no notice of default has been recorded, and no condition or event has occurred which would constitute a default upon the passage of time or the giving of notice, the lien of this Deed of Trust shall be made subject and subordinate to the lien of a senior deed of trust to secure a senior loan made to Trustor for the acquisition of the Subject Property and/or the construction of offsite improvements to the Subject Property . . . upon the following terms . . . ." In addition to

to the seller as the result of subordination to a construction loan and we agree with defendants that *Budget Realty* is dispositive. Accordingly, the trial court correctly determined that recovery of the deficiency against defendants personally was barred by Code of Civil Procedure section 580b.

### C. *Does the Antideficiency Statute Apply to a Person Who Commits a Tort?*

Mr. Webber finally argues that the antideficiency statute should not be applied because of the tortious conduct of the defendants. He relies on *Bell v. Roy, supra,* 187 Cal.App.3d 694. In *Bell*, the seller sought to obtain a deficiency judgment against the buyer. Although the original financing included a second deed of trust in favor of seller, subsequent transactions by the buyer fraudulently deprived the seller of his security. Considering the applicability of Code of Civil Procedure section 580b, the court discussed *Spangler* and *Roseleaf* and held that the buyer's fraud precluded application of the antideficiency protections afforded by that section. The court noted that "A further exception to the antideficiency statute has been found where the trustor 'tortiously injures the mortgagee's security interest.' (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 139 . . . .)" (*Bell, supra,* 187 Cal.App.3d at pp. 699-700.)

In *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101 [135 Cal.Rptr. 802], a lender and land developer disagreed over the legal effect of certain loan and guarantee agreements. The lender attempted to recover damages for fraud and the developer raised the antideficiency bar as a defense. The court rejected the defense, holding that an action for fraud was not an action for a deficiency judgment. (*Id.*, at p. 139.) The court said: "The statutory provisions barring deficiency judgments were not intended to immunize a trustor or a third person who tortiously injures the mortgagee's security interest. A mortgagee whose secured interest has been impaired by tortious conduct of a third person is not barred by the antideficiency statutes from recovering damages for such impairment of security." (*Ibid.*)

While we agree with plaintiff that the antideficiency statutes should not be applied when the buyer engages in fraudulent conduct, the fact remains that the buyer here, Forecast Mortgage, was not found to be liable because of the rule that a party cannot be held liable for interfering with its own contract.

---

this provision for subordination to an acquisition and development loan, the agreement also provides a similar clause for subordination to a construction loan.

The Hyatt note also provides: "This is a purchase money second deed of trust loan, junior in lien to a first deed of trust in favor of Sanwa Bank."

(*Applied Equipment Corp.* v. *Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th 503.) Since the sixth cause of action sought to obtain a deficiency judgment against Forecast Mortgage, and since that entity did not engage in any tortious conduct, it can raise the antideficiency rule as a defense. Although application of the alter ego rule in this situation might change matters, plaintiff has not argued the applicability of the alter ego rule in this context. Thus, the trial court properly ruled that plaintiff was not entitled to a deficiency judgment.

### The Award of Attorney Fees

Following trial, certain defendants (prevailing defendants) filed a motion to recover their attorney fees. These defendants, All Cities Mini-Storage, The James Previti Family Trust, Forecast Development, and Forecast Homes of Northern California, pointed out that they had prevailed on the sixth cause of action by reason of the trial court's summary adjudication, and they had prevailed on the seventh cause of action by reason of the jury's special verdict. They sought attorney fees of $207,902.36. According to defendants' attorney, this sum represented one-half of the total attorney fees incurred. Forecast Mortgage subsequently filed its own motion for attorney fees on the grounds that it too had prevailed on the sixth cause of action. It sought attorney fees of $15,429.69.

After a hearing, the trial court granted Forecast Mortgage's motion for attorney fees in the amount requested, and also granted the prevailing defendants' motion in the sum of $67,638.12, "which represents four eighths of the fees incurred at the time the successful motion for summary adjudication was filed regarding the sixth cause of action."

As noted above, Mr. Webber attacks the grant of attorney fees by attacking the trial court's decision on the sixth cause of action. Although we have rejected Mr. Webber's attack on the sixth cause of action for the reasons stated above, we find that our rejection does not lead to an automatic affirmance of the trial court's attorney fees award.

In a letter to the parties, we raised an additional hurdle to the award of attorney fees. We questioned whether it was proper to affirm the award of attorney fees to the prevailing defendants when the trial court had found, in its decision on the first cause of action, that Mr. Previti "dominated and controlled each of these entities and made the final determination as to the acts taken by these entities." Indeed, Mr. Previti testified that he made all of the decisions for all of the Forecast entities. We therefore questioned whether an award of attorney fees was proper if each of the defendants was

the alter ego of the others. At our request, the parties submitted additional briefing on this issue. (Gov. Code, § 68081.)

The parties agree that the trial court had discretion under Civil Code section 1717 to award attorney fees to a prevailing party, or to determine that no party was the prevailing party.

Mr. Webber argues that, considering the alter ego findings, an award of attorney fees would be contrary to the liability findings. He contends "there is no true distinction between the defendants that were awarded attorneys' fees and the defendants that were found to be liable to WEBBER for $1,354,946.00." He seeks remand for the trial court to determine whether the defendants that were awarded attorney fees were the prevailing parties in light of the alter ego findings.

Mr. Webber relies on *Hilltop Investment Associates v. Leon* (1994) 28 Cal.App.4th 462 [33 Cal.Rptr.2d 552]. In that case, the appellant claimed that the trial court erred when it failed to award him attorney fees as the prevailing party on a cross-complaint. The appellate court rejected the contention. Although it noted that the appellant, Mr. Leon, had prevailed in the court below because the trial court had refused to hold him liable on an alter ego theory, it rejected the contention that the trial court was required to award him attorney fees under Civil Code section 1717. Instead, it upheld the trial court's determination that there was no prevailing party because it found that Mr. Leon was responsible for the diversion of funds to which the respondents were entitled. The court said: "Technically speaking, appellant was 'a prevailing party' in that personal liability was not visited upon him in the concept of alter ego. However, respondents were also prevailing parties in relation to the partnership over which appellant exerted control causing respondents to have to sue. While the court found insufficient evidence to pierce the corporate veil, it did find that appellant was, in effect, the cause of the action taken by the partnership resulting in litigation. Under the circumstances the result was a draw . . . ." (*Hilltop Investment Associates, supra,* at p. 468.) The appellate court therefore upheld the trial court's order denying attorney fees.

■■■ Defendants remind us that an award of attorney fees is discretionary (citing *Bruckman v. Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1062 [235 Cal.Rptr. 813]) and will not be disturbed without a showing that the trial court abused its discretion (citing *McLarand, Vasquez & Partners, Inc. v. Downey Savings & Loan Assn.* (1991) 231 Cal.App.3d 1450, 1456 [282 Cal.Rptr. 828]). Defendants find no abuse of discretion here, and persuasively argue that it is not unusual for a party to lose on a contract claim while prevailing on tort claims, or vice versa.

For example, defendants cite *Korech* v. *Hornwood* (1997) 58 Cal.App.4th 1412 [68 Cal.Rptr.2d 637]. In that case, the Hornwoods were the property owners who hired a general contractor. The plaintiffs were unpaid subcontractors. The plaintiffs filed suit to enforce their mechanics liens, and also sued the Hornwoods for breach of contract and unjust enrichment. The trial court found for the plaintiffs on the mechanic's lien claims, but found against them on the other two claims. It granted the Hornwoods their attorney fees because they had successfully defeated the contract claim. It also apportioned the amount because the plaintiffs prevailed on the mechanic's lien claims. (*Id.,* at p. 1416.) After discussing the issue of who was the prevailing party, the appellate court found that the trial court had acted within its discretion in apportioning the attorney fees.

The court in *Korech* relies on the leading case of *Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124 [158 Cal.Rptr. 1, 599 P.2d 83]. In that case, the plaintiff sought a recovery against the defendants, the shareholders and directors of a corporation, on an alter ego theory. The trial court rejected the alter ego claim and found the defendants were not personally liable for the corporate obligations. It also awarded attorney fees to the defendants.

Our Supreme Court held that: "Its purposes require section 1717 be interpreted to further provide a reciprocal remedy for a nonsignatory defendant, sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation against the defendant." (*Reynolds Metals Co.* v. *Alperson, supra,* 25 Cal.3d 124, 128.) It therefore found that the defendants could recover their attorney fees since they had prevailed by defeating the alter ego claims.

Our Supreme Court also held: "Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action. [Citations.] . . . [¶] Conversely, plaintiff's joinder of causes of action should not dilute its right to attorney's fees. Attorney's fees need not be apportioned when incurred for representation on an issue common to both a cause of a action in which fees are proper and one in which they are not allowed." (*Reynolds Metals Co.* v. *Alperson, supra,* 25 Cal.3d 124, 129-130.)

Thus, a party can win on some causes of action and lose on others, and it will be responsible for attorney fees on the contract cause of action if it loses on that cause of action, and if the contract contains an attorney fees provision.

▮▮▮ Here, we find it significant that the trial court was well aware of the alter ego issue and the claims arising from it. With such knowledge, it refused to apportion attorney fees between the various causes of action. Instead, it found that the causes of action for the prevailing defendants were so intertwined that particular charges could not be related to specific causes of action. As to Forecast Mortgage, the court found that it had prevailed on the only cause of action in which it was named.

We are therefore persuaded by defendants' argument that an abuse of the trial court's discretion has not been shown. While the trial court could have treated all of the defendants as one, it did not do so. Instead, it treated them separately, and we cannot say that it abused its discretion in doing so. We are finally persuaded by defendants' case authority: "The issue of allocation of costs between defendants who were united in interest and were represented by the same law firm was presented in *Smith* v. *Circle P. Ranch Co.* (1978) 87 Cal.App.3d 267 . . . , and the court held: 'In those instances in which several defendants are united in interest and/or join in making the same defenses in the same answer, the allowance or disallowance of an award to prevailing defendants lies within the sound discretion of the court. [Citation.]' [Citation.]" (*Slavin* v. *Fink* (1994) 25 Cal.App.4th 722, 726 [30 Cal.Rptr.2d 750], fn. omitted.) Here, the trial court did not apply the alter ego doctrine in deciding the attorney fees motions, and it treated the defendants as individual entities. We cannot say that it abused its discretion in doing so.

### DISPOSITION

The judgment, including the award of attorney fees to defendants Forecast Mortgage ($15,429.69), All Cities Mini-Storage, The James Previti Family Trust, and Forecast Homes of Northern California ($67,638.12), is affirmed. Mr. Webber is to recover his costs on appeal.

Ramirez, P. J., and McKinster, J., concurred.

The petition of appellant Donald G. Webber for review by the Supreme Court was denied December 1, 1999.