Filed 9/10/14  Brown v. Leckrone CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CHESTER A. BROWN, JR., et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>DANIEL E. LECKRONE,<br><br>  Defendant and Respondent. | H039389<br>(Santa Clara County<br> Super. Ct. No. 1-09-CV-159452) |

Plaintiffs Chester and Marcie Brown appeal from a judgment after a bifurcated trial in which the trial court determined that defendant and respondent Daniel Leckrone was not the alter ego of his wholly owned company, Technology Properties Limited, LLC (TPL).  Plaintiffs contend that the trial court ignored substantial undisputed evidence that supported a finding of alter ego liability.  Plaintiffs further argue that they should have been granted a new trial because (1) they had newly discovered evidence supporting their alter ego theory; and (2) at trial the court had improperly accepted expert testimony from a lay witness.  As an additional ground for a new trial and for reversal of the judgment plaintiffs contend that the court erroneously refused to impose sanctions on defendants for their failure to produce documents during discovery.  We find no basis for reversal and must therefore affirm the judgment.

*Background*

Leckrone, an attorney, founded TPL in 1988 and was its chairman, chief executive officer (CEO), and sole owner.  His objective was to assist in developing technologies

1

and products by contributing funding in exchange for "rights to use the result." Chester A. Brown, Jr. (Brown) was at various times a consultant to and an employee of TPL, as well as an investor in patent portfolios which TPL had the right to commercialize.

In 1999 Leckrone was seeking funding for the commercialization of a portfolio of "Hearing Health Care" (HHC) patents. Brown and his wife, Marcie Brown, invested $50,000 in the HHC portfolio, in exchange for one percent of the gross proceeds of any licensing of the portfolio. Plaintiffs invested another $50,000 in 2000 and then again in 2001.

In 2003 Brown became a consultant to TPL, serving as Chief Operating Officer on a project to commercialize the AsyncArray Devices (AAD) technology. The AAD entity was later renamed IntellaSys Corporation (IntellaSys). By 2006 Brown was functioning as the CEO of IntellaSys.

In August 2003 plaintiffs agreed to contribute another $25,000 for the HHC portfolio. This time the consideration was 3.5 percent of the gross proceeds of the licensing of both the HHC portfolio and another portfolio consisting of Moore Microprocessor Patents, based on technology developed by Charles Moore and Russell Fish. Leckrone drafted the resulting contract, the Assignment Agreement, which TPL and both plaintiffs executed in early 2004, but which was backdated to August 4, 2003.

In February 2006 everyone associated with TPL, including Brown, became a TPL employee. Later that year IntellaSys was merged into TPL.

Plaintiffs received payments from TPL under the Assignment Agreement through May 10, 2007. When Brown inquired about the failure to make further payments, no one denied that TPL owed him money. It was understood that TPL was unable to pay anyone who was entitled to payment. According to Dwayne Hannah, TPL's Chief Financial Officer (CFO), by the end of the second quarter of 2009 TPL's books showed that the company owed plaintiffs $1.801 million.

On December 15, 2009, plaintiffs brought this action against both TPL and Leckrone, primarily alleging breach of the Assignment Agreement. In November 2010 the court held a bench trial limited to interpretation of the "gross proceeds" and modification terms of the Assignment Agreement, and in July 2011 it agreed with plaintiffs' interpretation.

Meanwhile, the superior court addressed a first amended cross-complaint TPL had filed against plaintiffs. On September 27, 2011, the court issued an order granting in part plaintiffs' anti-SLAPP motion under Code of Civil Procedure section 425.16. This court affirmed that order on July 1, 2013. (H037664.) TPL filed a second amended cross-complaint on October 7, 2011.

The superior court bifurcated the causes of action against Leckrone, and the claims against TPL were tried before a jury. On April 18, 2012 the jury found TPL liable for breach of the Assignment Agreement and awarded plaintiffs $8,887,732.00. TPL received nothing on its cross-complaint. After calculating prejudgment interest, costs, and attorney fees, the court entered judgment for plaintiffs in the amount of $10,129,741.77.

On May 7, 8, and 21, 2012, the court took up the remaining issue, whether Leckrone could be held individually liable under an alter ego theory. On December 27, 2012, the court issued its statement of decision and judgment, finding that Leckrone was not the alter ego of TPL. After their motions to vacate the judgment and for a new trial were denied, plaintiffs brought this appeal.

*Discussion*

1. *Substantial Evidence of Alter-Ego Liability*

Plaintiffs first contend that the "undisputed, substantial evidence showed that Dan Leckrone is the *alter ego* of TPL." They mention the familiar substantial evidence rule, which requires the appellate court to view all factual matters in the light most favorable to the prevailing party and draw all reasonable inferences to uphold the verdict if

3

possible.  The reviewing court may not reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony.  (*Munoz v. Olin* (1979) 24 Cal.3d 629, 635-36; *Associated Builders and Contractors*, *Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 374.)

"But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.  This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case . . . .  [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' "  (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528; accord, *Valero v. Board of Retirement of Tulare County Employees' Retirement Assn.* (2012) 205 Cal.App.4th 960, 966.)

To the extent that plaintiffs' argument revisits the trial evidence to show that "substantial undisputed evidence" supports a finding of alter ego liability, we must apply the principle articulated in *In re I.W.*, quoted above.  We will not indulge in a reweighing of the evidence to determine whether we would have found the facts in plaintiffs' favor. On the other hand, to the extent that plaintiffs are contending that their alter-ego evidence was uncontradicted, unimpeached, and " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding,' " we

4

address the issue to determine whether a judgment in plaintiffs' favor was compelled as a matter of law. (*Ibid*; see *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571 [even if plaintiffs' evidence was "uncontradicted and unimpeached . . . it would not necessarily follow that it was of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding in favor of [plaintiffs]"].)

" 'Alter ego is a limited doctrine, invoked only where recognition of the corporate form would work an injustice to a third person.' [Citation.] 'The essence of the alter ego doctrine is that justice be done . . . . Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require.' [Citation.]" (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 810; see also *Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539 [alter ego is "an extreme remedy, sparingly used"].)

"The conditions under which the corporate entity may be disregarded, or the corporation be regarded as the *alter ego* of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court." (*Stark v. Coker* (1942) 20 Cal.2d 839, 846.) Nevertheless, courts have generally applied two requirements for application of this doctrine: (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072, citing *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 900; *Automotriz Del Golfo De California S. A. De C. V. v. Resnick* (1957) 47 Cal.2d 792, 796.) " 'Both of these requirements must be found to exist before the corporate existence will be disregarded, and since this determination is primarily one for the trial court and is not a question of law, the conclusion of the trier of fact will not be disturbed if it is supported by substantial evidence.' [Citation.]" (*Misik v. D'Arco, supra*, 197 Cal.App.4th at p. 1072.)

5

Determining the first requirement for applying the alter ego doctrine—a "sufficient unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist"— involves consideration of a variety of factors, none of which is necessarily conclusive. (*Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1073; *Associated Vendors*, *Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 840 (*Associated Vendors*).)[1] The list, though extensive, is not exhaustive; "these enumerated factors may be considered with others under the particular circumstances of each case." (*Misik v. D'Arco*, *supra*, 197 Cal.App.4th at p. 1073, citing *Zoran Corp. v. Chen, supra,* 185 Cal.App.4th at p. 812; *Associated Vendors*, *supra*, 210 Cal.App.2d at p. 840.)

---

[1] Many of these were listed in *Associated Vendors*, *supra*, 210 Cal.App.2d at pp. 839-40: "Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses [citations]; the treatment by an individual of the assets of the corporation as his own [citations] . . . the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities [citations]; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family [citations]; the use of the same office or business location; the employment of the same employees and/or attorney [citations]; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; the use of the corporate entity to procure labor, services or merchandise for another person or entity [citations]; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations]; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions [citations]; and the formation and use of a corporation to transfer to it the existing liability of another person or entity."

Plaintiffs contend that "[s]ubstantial, undisputed evidence" demonstrated that "at least ten" of these factors were present here, particularly the commingling of assets and the disregard of corporate formalities. They first maintain that Leckrone commingled TPL's assets with his own, by directing TPL to pay him large amounts which were recorded as payment to his adult children but which they had not authorized, and which were made pursuant to unsigned contracts that had not been seen by Dwayne Hannah, TPL's CFO. In plaintiffs' view, "[t]his transaction alone is the essence of commingling funds, as Dan Leckrone simply treated TPL's bank account as his personal bank account." Plaintiffs further emphasize the payments TPL made in order for Leckrone to acquire three companies (OnSpec, Chipscale, and Indigita) and TPL's payment of the operating expenses of those companies along with those of Alliacense, also Leckrone's wholly owned company.[2]

The evidence on this point, however, was not undisputed. Susan Anhalt, Leckrone's daughter and a TPL employee, not only served as vice president of TPL's law department, but also handled Leckrone's personal bank accounts and his one investment account. She testified that there had been no commingling of her father's personal accounts with any account of TPL or of any other "operating entity." And Hannah testified that when he joined TPL in September 2005 he instituted procedures to make sure that the company was keeping its books and records in accordance with "accounting policies." He had never found a transfer of funds from TPL to Leckrone "for a purely personal reason" or without a "proper, thorough explanation of the purpose for those

---

[2] Hannah explained the function of Alliacense: "A. Alliacense is primarily the entity that manages the [TPL] portfolio. They seek to gain value from the portfolio by analyzing portfolio, technical analysis, [and] business analysis and they have a sales force which works with entities that are using the technology. I mean they are the entity that really drives the revenue for the company. . . . I mean without Alliacense there would be-- there probably would not be any moneys coming into the organization."

7

funds"; and he had never found any indication that any of Leckrone's family members had improperly used TPL funds. Hannah was asked whether Leckrone had ever commingled his personal funds with those of TPL, whether Leckrone had instructed him to do anything in his job that he thought was improper, and whether Leckrone had directed him to transfer money in an improper way or improperly account for a transfer of money. Hannah answered "no" to questions about all of these circumstances.

As the trier of fact, the superior court was entitled to credit these witnesses' testimony and consider it in determining the issue of commingling; it is not for us to decide on appeal that we would have drawn a different conclusion on the evidence presented. As discussed earlier, that substantial evidence supported plaintiffs' position does not mean that the verdict must be overturned, because this is a case in which plaintiffs simply failed to meet their burden of proof at trial. Because we cannot say that on this record the court below was compelled to find commingling of assets as a matter of law, reversal is not warranted on this ground.

Plaintiffs devote a significant part of their appellate briefs to the argument that the "unity of interest and ownership" condition was met by "undisputed evidence" that TPL distributed "tens of millions of dollars to Dan Leckrone at a time when TPL was not able to pay its debts, such as funds owed to the Browns." According to plaintiffs, TPL thus violated both its own corporate rules and sections 501 and 17254 of the Corporations Code.[3] The superior court acknowledged that "it can be presumed that Leckrone made

---

[3] Corporations Code section 501 states, "Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) if the corporation or the subsidiary making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payment is otherwise adequately provided for) as they mature."

Before its repeal in 2013, former Corporations Code section 17254, subdivision (a), the provision cited by plaintiffs, stated, "(a) No distribution shall be made if, after giving effect to the distribution, either of the following occurs: [¶] (1) The limited liability

8

the major decisions relating to the organization including distributions to himself, assignees, operating companies and others." The court viewed Leckrone's ownership and control as insufficient alone to deem him the alter ego of TPL. It also found no evidence that the challenged distributions amounted to a violation of either the Corporations Code or TPL's own bylaws and operating agreement. Addressing the distributions themselves, the court found that Leckrone's family members who were employed by TPL were not disproportionately compensated.

Distributions to Leckrone himself for acquisition and operating expenses of companies he owned were also explained by the court. Those payments to purchase OnSpec, Chipscale, and Indigita were made directly to the companies, with distributions credited to Leckrone. It was significant to the court that TPL held exclusive licenses with each of these companies; thus, all aspects of ownership and use were under TPL's control, though "naked legal title lies with an LLC owned by Leckrone." The acquisition of these licenses "was compl[e]mentary with [IntellaSys], the chip division of TPL headed by Chester Brown [and was] commercially prudent and provided operational flexibility. . . . At best [their acquisition] resulted in a gain to the company; at worst the acquisition may have been a failure or, so far, unproductive but that simply leaves it as a business judgment issue and not a misdirection of funds. Plaintiff[s] introduced no evidence to suggest that the amounts actually paid for the patent rights owned by these several companies was out of line or untoward regardless of distribution or ownership." Thus, the court saw no actionable conduct involving these licenses, even if Leckrone was in charge of directing TPL to make the purchases.

---

company would not be able to pay its debts as they become due in the usual course of business. [¶] (2) The limited liability company's total assets would be less than the sum of its total liabilities plus, unless the operating agreement provides otherwise, the amount that would be needed, if the limited liability company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other members upon dissolution that are superior to the rights of the member receiving the distribution."

Likewise, the court found no evidence that TPL's payments to Alliacense were improper, whether they were payments under their service contract or loans made to cover Alliacense's operating expenses.[4] We cannot impose on the judgment our independent view of the evidence by reweighing the testimony and exhibits presented at trial.

We reach the same conclusion regarding plaintiffs' claim that distributions of at least $3.2 million to Leckrone family members were improper, as they were made without signed assignment contracts and at a time when TPL was experiencing a " 'cash crisis' " in 2007 and 2008. In rejecting this contention the court apparently credited Hannah's testimony that he found no improper use or accounting of funds by Leckrone or any of his family members. The court also heard, and apparently believed, Anhalt's testimony that she paid $154,000 in cash and stock for a percentage interest in the disputed assignment contract. The court concluded that similar assignment contracts with Leckrone's other two children were, like Anhalt's, "valid and enforceable" even though none of the three was signed by the assignee.[5]

In short, the trial court, after hearing several days of testimony and receiving numerous exhibits into evidence, applied the *Associated Vendors* criteria and found that plaintiffs had not shown a unity of interest and ownership between Leckrone and TPL. The standard by which this court has reviewed the trial evidence does not permit us to reweigh the testimony and exhibits and revisit conflicts in the evidence that the lower

---

[4] Alliacense was paid 15 percent of licensing revenues plus additional amounts for operating expenses. Alliacense also received financial assistance from TPL, which was reflected as an obligation to TPL on Alliacense's books. Hannah described some payments that were accounted for as distributions to Leckrone and then a contribution by him to Alliacense.

[5] All three assignment contracts were dated January 5, 2003 and signed by Leckrone as chairman of TPL. No assignee signatures were on the three documents.

10

court resolved as trier of fact. In this case we cannot say that the evidence of unity of interest and ownership was " 'of such a character and weight as to leave no room for a judicial determination' " that Leckrone was not the alter ego of TPL. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Because plaintiffs failed to meet their burden of proof on this prong of the alter ego test, it is unnecessary to address the trial court's additional finding that the evidence was "insufficient to establish . . . that an inequitable result would occur if the acts in question were treated as those of TPL alone."[6]

## 2. *Expert Testimony*

In its statement of decision the court observed that the testimony of CFO Dwayne Hannah, the only witness with "accounting expertise,"[7] was uncontradicted, thus demonstrating to the court that "strict accounting and financial policies were established and followed consistent with generally accepted accounting principles." One of the grounds on which plaintiffs moved for a new trial was that the court had improperly treated Hannah as an expert witness without his being designated and qualified as such. In their motion plaintiffs contended that in a new trial they would produce the testimony of their own experts, and they submitted those experts' declarations, in which one stated that "characterizing a payment of $2.2 million as a payment to Daniel E. Leckrone's adult children was inconsistent with the principles underlying Generally Accepted Accounting Policies (GAAP)."

On appeal, plaintiffs assert error in the court's refusal to grant a new trial "to allow them to litigate fairly." We examine this issue in accordance with the abuse-of-discretion

---

[6] It is also unnecessary to address Leckrone's assertion that, based on the evidence at trial, plaintiffs are estopped to pursue alter ego liability against Leckrone.

[7] Hannah held an MBA and was a certified public accountant. When he joined TPL he tried to improve the accounting procedures so that the books and records were kept "in accord with accounting policies."

11

standard of review. Addressing questions calling for lay opinion testimony, the Supreme Court explained nearly 100 hundred years ago, "The true rule is simple and, so far as this state is concerned, well established: to permit, or to refuse to permit, such questions is a matter resting largely in the discretion of the trial court, which discretion will not here be reviewed unless it is made plain that the court's ruling in admitting the evidence has worked an injury. Generally speaking, the admission of the [testimony] cannot work an injury where a fair latitude upon cross-examination is allowed, for under such cross-examination the facts are certain to be adduced. It will be found frequently that an appellate tribunal upholds the rulings of the trial court in sustaining an objection to such questions, but the cases are far less numerous where it has felt compelled to reverse the inferior tribunal for permitting them." (*Nolan v. Nolan* (1909) 155 Cal. 476, 480-481; see Evid. Code, § 800 [lay opinion testimony must be rationally based on the perception of the witness and helpful to a clear understanding of his testimony].)

Leckrone dismisses plaintiffs' contention as meritless because plaintiffs themselves "elicited the only testimony from Mr. Hannah on whether TPL complied with generally accepted accounting principles." That statement misrepresents the record. It is true that plaintiffs' counsel asked Hannah to explain his "understanding under generally accepted accounting principles of what the term 'contribution' means." But that question was confined to the definition of a term contained in the Corporations Code, and it was posed to Hannah *after* the witness had mentioned GAAP under questioning by defense counsel. On that prior occasion Hannah was asked about the procedural changes he had made when he took over the books and records of TPL in September 2005. Hannah explained that he had found it necessary to "institute some policies to formalize certain procedures within the finance accounting group . . . to make sure that we clearly kept the books and records in accordance . . . with accounting policies.[Q]: Generally accepted accounting principles, is that – [A.] Yes, that's correct."

12

This line of questioning, however, was not met with a timely objection by plaintiffs. They did not complain about the witness's "expert opinion" in relation to GAAP until after both sides had submitted their posttrial briefs and after the court had issued its tentative decision. Had they objected when GAAP was first mentioned in the course of Hannah's testimony, they could have requested an opportunity to present their own rebuttal experts. In any event, whatever reliance the court placed on Hannah's opinion regarding GAAP was at most harmless error, because Hannah's testimony in this vein was confined to his efforts to "clean things up" in TPL's books and records-- and later, in response to questioning by plaintiffs' counsel, his understanding of the term "contribution." In testifying that no impropriety had occurred with regard to improper transfers, accounting, and personal use of funds, Hannah did not state that his opinion was based on GAAP. Consequently, even if their objection was not forfeited, the reference to GAAP was a relatively insignificant part of Hannah's testimony. Moreover, reopening the trial to present plaintiffs' own experts would have permitted them to introduce testimony on different subjects than those on which Hannah had been questioned in relation to the GAAP. The court did not err in denying plaintiffs that opportunity to belatedly introduce new evidence.

*3. Newly Discovered Evidence*

Another ground of plaintiffs' January 2013 motion for new trial (and a concomitant motion to vacate judgment) was their discovery that in July 2012, after the close of the alter ego trial, TPL submitted a complaint to the Court of International Trade for the United States International Trade Commission (ITC) which, according to plaintiffs, demonstrated that Leckrone was the alter ego of TPL. In that verified pleading TPL and two other complainants accused numerous companies of patent infringement.

13

One of the paragraphs stated that TPL had "teams of employees" for licensing and never mentioned Alliacense.[8]

Plaintiffs noted that this description represented TPL, rather than Alliacense, as the entity that was "conducting TPL' s licensing activities." It assertedly contradicted testimony by Leckrone's son "Mac" Leckrone, president of Alliacense, that Alliacense did the licensing for TPL and no longer relied on any of TPL's employees for assistance.

In his opposition Leckrone pointed out that the identical allegations had been made in a prior ITC complaint filed on August 24, 2011 and in another filed on March 27, 2012.[9] Consequently, Leckrone argued, this evidence was not newly discovered, nor was it material within the meaning of the governing statute, Code of Civil Procedure section 657. That provision permits the court to grant a new trial for newly discovered evidence "material for the party making the application, which he could not, with reasonable diligence, have discovered and produced at the trial."

"Applications for new trials upon the ground of newly discovered evidence must be looked upon with suspicion and disfavor, because the temptation to make a favorable showing after having sustained a defeat is great. A party who relies upon that ground must make a strong case, both in respect to diligence on his part in preparing for the trial, and as to the truth and materiality of the newly discovered evidence, and that, too, by the best evidence which can be obtained. If he fails in either respect, his motion must be denied." (*Arnold v. Skaggs* (1868) 35 Cal. 684, 688.) "[T]he party seeking relief has the

---

[8] The complaint included the following statement: "TPL also employs teams of many other specialists to: (a) procure products of potential licensees; (b) deconstruct and 'tear down' products of potential licensees (including detailed photography of the products); (c) analyze 'tear down' reports and prepare claim charts; (d) correspond with potential licensees; ( e) make in-person presentations and negotiate licenses, and (f) ensure licensee compliance with royalty and reporting obligations."

[9] Defense counsel advised the trial court that he had found copies of these publicly available complaints by entering "tpl" and "itc" in a Google search.

burden to prove that he exercised reasonable diligence to discover and produce the evidence at trial. If he does not make this showing, the motion must be denied." (*In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 153-154; see also *Slemons v. Paterson* (1939) 14 Cal.2d 612, 616 ["It is a matter of public interest that there be an end to litigation and that a new trial should not be granted for the purpose of enabling a party to produce further evidence unless he has shown some legally justifiable excuse for not having produced such evidence at the former trial."])

Even if we were to disagree with Leckrone that the evidence was immaterial, we would not find reversal appropriate. A motion for new trial based on newly discovered evidence is a matter within the trial court's broad discretion, and its ruling on the motion "will not be disturbed unless an abuse of discretion is clearly shown." (*Maloof v. Maloof* (1917) 175 Cal. 571, 574; *Plancarte v. Guardsmark* (2004) 118 Cal.App.4th 640, 645-46.) In this case, because the evidence was publicly accessible before trial on the alter ego allegations, the superior court could have concluded tPhat with reasonable diligence TPL's representations to the ITC could have been discovered earlier and produced at trial. Thus, on this record we cannot say that the court clearly abused its discretion by denying plaintiffs' motion.

*4. Discovery Sanctions*

Plaintiffs further challenge the trial court's denial of their request for a new trial and sanctions against Leckrone based on TPL's failure to produce certain documents during discovery. For example, plaintiffs had requested contracts between TPL and companies in which Leckrone had a financial or ownership interest. On May 4, 2012, the Friday before the alter ego portion of the trial, TPL belatedly produced an "Agreement and Plan or Merger between Dan Leckrone, TPL, Oban Acquisition Corp. and OnSpec Electronic, Inc." The first day of the alter ego portion of the trial, plaintiffs moved for

"terminating sanctions or issue preclusion sanctions" against Leckrone.[10] In opposition to the sanctions motion Susan Anhalt, Leckrone's daughter and TPL's attorney, declared that "TPL's only involvement in the agreement was to provide representations and warranties and guarantee to the OnSpec selling shareholders." Anhalt also stated that "the OnSpec Merger Agreement was well known to Mr. Brown as early as April 2006."

In the ITC pleading, however, TPL alleged that it had "participated in the acquisition of OnSpec in April 2006." Plaintiffs highlighted this statement in their motion for new trial, claiming that it contradicted their statements in opposition to the sanctions motion. Plaintiffs take the same position on appeal. Had TPL produced the agreement before the discovery cutoff on December 29, 2011, plaintiffs "could have retained an expert witness to discuss the way in which the OnSpec agreement was further evidence of commingling of Dan Leckrone's and TPL's funds." Plaintiffs thus contend that the court erred in denying its motion for discovery sanctions.

Like an order denying a new trial, an order denying sanctions for discovery abuse is within the court's broad discretion. (Cf. *Colgate-Palmolive Co. v. Franchise Tax Bd.* (1992) 10 Cal.App.4th 1768, 1788 aff'd sub nom. *Barclays Bank PLC v. Franchise Tax Bd. of California* (1994) 512 U.S. 298.) "An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason. [Citation.] It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is reasonable." (*Stull v. Sparrow* (2001) 92 Cal.App.4th 860, 864.)

We cannot find such abuse here. This case is not comparable to *Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152, 1163, on which plaintiffs rely. There

---

[10] On June 13, 2012, by stipulation of the parties, the court reset the hearing on the sanctions motion to August 3, 2012. Leckrone's written opposition and plaintiffs' reply were filed on July 23 and 27, 2012, respectively.

16

the trial court denied the motion for sanctions in the belief that it was not authorized to grant relief after the conclusion of the trial; consequently, it did not consider the merits of the request.  Given the multiple instances of the defendant's admitted deception and intentional concealment of material evidence during discovery, the appellate court held that the lower court "should have reached the merits and found monetary sanctions absolutely mandated." (*Id*. at p. 1163, italics omitted.)  In this case, the trial court could have determined that TPL and Leckrone had not engaged in a material abuse of the discovery process because TPL's opposition to the sanctions motion had not "directly contradicted" the ITC filing.  In the ITC pleading TPL claimed only that it "participated" in the acquisition of OnSpec, which the court could have found was consistent with its more detailed assertion that it provided "certain representations and warranties and a guarantee to the selling shareholders of OnSpec."  An abuse of discretion is not clearly evident in this instance.

Our conclusion is the same with respect to Exhibit 1583, a summary of TPL's distributions to various recipients (including plaintiffs and Leckrone) between July 2004 and February 2012.  During discovery plaintiffs had requested all documents "that discuss, refer, or relate to any distributions" from TPL to Leckrone.  On December 19, 2011, the trial court ordered TPL and Leckrone to provide documents responsive to this and other document requests.  Only on May 7, 2012, the first day of the alter ego trial, did TPL provide plaintiffs a copy of Exhibit 1583.  During Hannah's testimony the court admitted Exhibit 1583 over plaintiffs' objection.  Plaintiffs' motion for "terminating sanctions or issue preclusion sanctions" asserted that the failure to provide this and other documents was a willful act of disobeying the court's order and justified a finding that Leckrone was the alter ego of TPL.

On appeal, plaintiffs contend that the denial of their sanctions motion was prejudicial error, because Exhibit 1583 was "a summary of other documents that TPL never produced.  Had TPL produced Trial Exhibit 1583 and the underlying support, the

17

Browns would have been able to examine witnesses on this key issue of the tens of millions of dollars that TPL diverted to Dan Leckrone." Defendants established, however, that the challenged exhibit could not have been produced during discovery, because it was a document prepared by Hannah on May 2, 2012, at the direction of defense counsel. This fact, derived from Hannah's declaration in opposition to the motion, suggested an absence of bad faith or willfulness and thus constituted a sufficient ground for the trial court's implied finding that the requested sanctions were not warranted. (Cf. *Bookout v. State ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1485 [no abuse of discretion in refusing to impose discovery sanctions where failure to produce documents was not in bad faith.])

5. *Motion for Judicial Notice*

Plaintiffs have moved in this court for judicial notice of two documents filed in the United States Bankruptcy Court, TPL's "Summary of Schedules" and its "Summary of Financial Status," in order to provide further evidence of the following facts. First, plaintiffs contend that the Summary of Schedules demonstrates that TPL concealed the entire OnSpec agreement, which showed that, contrary to Anhalt's declaration, "TPL not only paid for and guaranteed the personal purchase by [Leckrone], but . . . also provided a security interest in TPL's assets for the purchase." Plaintiffs specifically seek "to show that the On[S]pec selling shareholders have filed a claim for that debt as one secured by TPL's assets, and that TPL has not disputed that debt. This information is further evidence of Respondent's commingling." Second, plaintiffs contend, the Summary of Schedules lists claims made by Leckrone's adult children, thus contradicting Leckrone's argument that TPL's payments of $3.2 million to Leckrone under alleged contracts with the children were valid and enforceable. In plaintiffs' view, these claims, which are listed in the schedule as "disputed," reveal the transactions as fraudulent. The Summary of Schedules also lists Leckrone's own claim for $3,845,000, which TPL has not disputed. According to plaintiffs, "this security interest shows that [Leckrone] has placed

18

his debts above the debts of other unsecured creditors, including . . . Appellants, and thus this document is further evidence of the inequity that results if the Court fails to find that Respondent is the *alter ego* of TPL."

Finally, the Summary of Schedules lists an undisputed claim of Alliacense of only $1,708,641. The schedule did not list the debt of $15 million that Hannah had testified was owed to TPL by Alliacense. Plaintiffs cite this discrepancy as "further evidence that Respondent has commingled funds by instructing TPL to pay Alliacense tens of millions of dollars without a signed, written contract and by paying $15 million in operating expenses listed as a debt that mysteriously disappeared after the *alter ego* trial."

We will take judicial notice of the existence of those pleadings in the Bankruptcy Court (Evid. Code, § 452, subd. (d)(2)), but we decline to take new evidence on appeal in the form of the facts stated or suggested in those documents. It is beyond question that "[t]he truth of any factual matters that might be deduced from official records is not the proper subject of judicial notice." (*Lockley v. Law Office of Cantrell*, *Green*, *Pekich*, *Cruz & McCort* (2001) 91 Cal.App.4th 875, 885.) That statement is all the more applicable to statements made by debtors in bankruptcy. "The circumstances under which an appellate court can receive new evidence after judgment . . . are very rare. . . The power to take evidence in the Court of Appeal is never used where there is conflicting evidence in the record and substantial evidence supports the trial court's findings. [Citations.] Plainly the above-described evidence does not meet these tests." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1090.)

In summary, the trial court performed its duty as factfinder in determining that plaintiffs had not met their burden to prove Leckrone's status as alter ego of TPL. Whether this court would have reached the same conclusion is immaterial, because the established standard of review does not permit us to reweigh the evidence presented at

19

trial.  We further find no abuse of discretion in the court's rulings on plaintiffs' motions for new trial and discovery sanctions.  Reversal is not required.

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.