Filed 12/1/14  WebQuest v. Fuentes CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| WEBQUEST, INC.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUPE FUENTES et al.,<br><br>    Defendants and Appellants. | B249455<br><br>(Los Angeles County<br>Super. Ct. No. BC471465)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 17, 2014, and not certified for publication, be modified as follows:

1.  On the title page, the name of the superior court judge was erroneously listed as "Steven J. Kleifeld, Judge."  It should read:  "Steven J. Kleifield, Judge."

The foregoing does not change the judgment.

_____

**PERLUSS, P. J.**                    **WOODS, J.**                    **ZELON, J.**

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| WEBQUEST, INC., | B249455 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BC471465) |
| LUPE FUENTES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven J. Kleifeld, Judge.  Affirmed.

Law Offices of Jeffrey S. Benice and Jeffrey S. Benice for Defendants and Appellants.

Davis Wright Tremaine, Jennifer L. Brockett and Rochelle L. Wilcox for Plaintiff and Respondent.

_____

*INTRODUCTION*

The plaintiff sued the defendants (two individuals and a limited liability corporation) for breach of an indemnity provision contained in a consulting agreement between the plaintiff, one of the individual defendants and the corporation. The plaintiff alleged the second individual defendant was the alter ego of the corporation. Following a bench trial, the trial court entered judgment in favor of the plaintiff against all of the defendants. The defendants appeal, arguing that (1) the plaintiff was "actively negligent" and therefore barred as a matter of law from seeking indemnity under *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, and (2) "no evidence" supports the trial court's alter ego finding. We affirm.

*FACTUAL AND PROCEDURAL SUMMARY*

In October 2011, WebQuest, Inc. filed a complaint for breach of contract, accounting and unfair business practices against Lupe Fuentes LLC, Lupe Fuentes aka Zuleydy Vergara and Evan Seinfeld.[1] The "WebQuest Master Consulting Agreement" (Agreement) attached as an exhibit to the complaint was signed by Zuleydy Vergara on behalf of "Lupe Fuentes, an individual" and by Evan Seinfeld on behalf of "Lupe Fuentes LLC."[2] WebQuest alleged Evan Seinfeld is the alter ego of Lupe Fuentes LLC.

According to the Agreement, Lupe Fuentes was to provide content at specified intervals to be posted on a new website (www.ilovelupe.com) and, with limited exceptions, would not provide any content to any websites or online services other than WebQuest; WebQuest was to be the "sole provider of services related to marketing, promoting, distributing and selling any content featuring Performer [meaning Lupe

---

[1] According to the record, "Lupe Fuentes" is Zuleydy Vergara's "stage name." Seinfeld and Fuentes (Vergara) are married.

[2] In the Agreement, the parties defined "Performer" to mean "Lupe Fuentes (an individual) [(Vergara)] and Lupe Fuentes LLC, collectively." We include both Lupe Fuentes LLC and Lupe Fuentes (Zuleydy Vergara) in our further references to Lupe Fuentes unless otherwise indicated.

Fuentes LLC and Lupe Fuentes, individually] Online[.]" The parties were to share net profits, primarily from subscription fees paid by customers.

WebQuest alleged Lupe Fuentes had provided to WebQuest copyrighted material owned by a third party (Samson Investments AVV), and this third party had filed suit against WebQuest and Lupe Fuentes. According to Section 12.2.4.(c) of the Agreement, "Performer"—meaning both Lupe Fuentes LLC and Lupe Fuentes (Vergara)— "represents and warrants that: . . . [¶] "provided that WebQuest is not in violation of any *explicit written instruction of Performer* as to the following, the Performer *Content*, Performer name, *and anything else provided by Performer*, *and WebQuest's possession and use* of any of the foregoing, *will not infringe any third party rights, including* but not limited to *copyrights*, trademark rights and privacy rights . . . ." (Italics added.)

WebQuest alleged Lupe Fuentes had breached its duty to defend and indemnify WebQuest in the third party's action as it had become obligated to do under Section 14.2 of the Agreement (entitled "Indemnity"): "Performer [Lupe Fuentes] agrees to defend, at its own expense, any claim or action against WebQuest . . . based upon a claim that Performer or any of its affiliates has violated or infringed any right of any third party, or breached any warranty set forth in this Agreement. Performer shall indemnify and hold harmless WebQuest . . . from and against any and all damages, liabilities, losses and any costs and expenses (including, but not limited to, attorneys' fees) incurred as a result of any such claim or action. . . . Performer's obligation under this Section shall extend to all claims against WebQuest . . . regardless of whether such claims were first asserted prior to the execution of this Agreement. . . ."

Lupe Fuentes and Seinfeld answered. The parties conducted discovery and then proceeded to a bench trial.

WebQuest, Seinfeld, Vergara (Fuentes) and Lupe Fuentes LLC stipulated to the following facts at trial:

"1. Evan Seinfeld, Zuleydy Vergara, and Lupe Fuentes LLC entered into the WebQuest Master Consulting Agreement (the 'Agreement') . . . .

3

"2. The Agreement . . . was entered [into] in August 2011 [sic, 2010].[3]

"3. The term of the Agreement . . . was from April 1, 2010 to March 31, 2012.

"4. Pursuant to the Agreement . . . , WebQuest provided design and programming services and technical development of the Website at URL www.ilovelupe.com (the 'Website'), registering, hosting, and operating the Website.

"5. [Seinfeld, Vergara and Lupe Fuentes LLC] provided content to WebQuest to upload onto the Website.

"6. At least some content provided by [Seinfeld, Vergara and Lupe Fuentes LLC] was uploaded to the Website.

"7. WebQuest arranged for payment processing for the Website.

"8. After being given notice of a potential claim by Samson Investments AVV ('Samson'), WebQuest tendered its defense to [Seinfeld, Vergara and Lupe Fuentes LLC].

"9. [Seinfeld, Vergara and Lupe Fuentes LLC] accepted the tender of the [d]efense.

"10. [Seinfeld, Vergara and Lupe Fuentes LLC] hired David Beitchman to represent them and WebQuest in the action captioned *Samson Investments, AVV v. Evan Seinfeld et al.,* United States District Court for the Central District of California Case No. 2:10-cv-06178-CAS-AGR, filed August 18, 2012 (the 'Samson Action') . . . .

"11. In May 2011, David Beitchman requested to withdraw from representing WebQuest in the Samson action.

"12. WebQuest sought new counsel to defend it in the Samson action.

"13. L[upe ]F[uentes ]LLC is a sole member LLC, with Evan Seinfeld as the sole member.

"14. L[upe ]F[uentes ]LLC maintains an address at the home of Evan Seinfeld and Lupe Fuentes [Vergara].

---

3      It is undisputed the agreement was entered into in August 2010 (not 2011).

4

"15.  Evan Seinfeld makes all decisions for L[upe ]F[uentes ]LLC.

"16.  Evan Seinfeld controls the bank accounts for L[upe ]F[uentes ]LLC, which is held with Chase Bank.

"17.  Evan Seinfeld and Lupe Fuentes also maintain an account with Chase Bank.

"18.  Evan Seinfeld transfers funds from the L[upe ]F[uentes ]LLC account to his personal account."

According to additional evidence presented at trial, the parties began working together in early 2010, before a written agreement was in place.  In mid-April, Fuentes (Vergara) appeared on "The Howard Stern Show" and Stern announced the www.ilovelupe.com website to his listeners.  Seinfeld believed it was "important to capitalize on that publicity and bring the website live as soon as possible."  Within days after the Howard Stern Show appearance, Seinfeld provided to WebQuest a hard drive containing a number of videos that had already been produced.  Seinfeld told Ken Lawson (WebQuest's CEO):  "'Use this content to get the website started and we're going to immediately start producing content to fill up the library.'"  According to Lawson, "Seinfeld had, on numerous occasions, assured [WebQuest] that he had full rights to the content."

On July 23, 2010, WebQuest received a "take-down notice" from Samson Investments claiming that most of the videos WebQuest had posted to the www.ilovelupe.com website were subject to copyrights Samson held; WebQuest removed the videos immediately.  According to Lawson, the parties discussed the urgency to finalize their agreement as they were operating without a written agreement in place, and it was important to WebQuest that the agreement be made effective as of April 1, 2010, when it began operating the website.

Samson sued WebQuest, Lupe Fuentes and its principals and others, alleging its copyrights had been infringed through the months the content had been posted.  In accepting WebQuest's tender of defense and engaging Beitchman to represent Lupe Fuentes LLC, Seinfeld and WebQuest jointly, Seinfeld and Vergara (through Beitchman)

5

acknowledged the indemnity provision applied and assured WebQuest Lupe Fuentes LLC would bear all costs and damages associated with the Samson action. In May 2011, however, Beitchman moved to withdraw and informed WebQuest he had not been paid, he believed there was a conflict and he could not continue the representation. WebQuest secured independent counsel to defend itself in the Samson action. After continued litigation, in August 2011, WebQuest entered into a good faith settlement with Samson (to which Seinfeld and Lupe Fuentes LLC stipulated) for a payment of $61,250 plus 50 percent of the net revenues accrued on the website from July 1, 2011 through March 31, 2012.

After taking the matter under submission, the trial court found the evidence established Lupe Fuentes had breached its contractual duty to defend and indemnify WebQuest.[4] Lupe Fuentes provided the content to WebQuest to post in April 2010, and both parties received Samson's take-down notice in July. While not all of the demands were met, WebQuest immediately removed the allegedly copyrighted material from the website. The trial court found: "These events no doubt played a role in the parties including the effective date of April 1 in the consulting agreement signed in August 2010."

The trial court further observed that although Lupe Fuentes accepted WebQuest's tender of defense and hired attorney David Beitchman to represent the parties in the Samson action, Beitchman later withdrew from the representation indicating he was not being paid, and Lupe Fuentes no longer provided WebQuest with a legal defense following Beitchman's withdrawal.

The trial court noted Lupe Fuentes's "primary claim" was that WebQuest was barred from seeking indemnity under *Rossmoor Sanitation Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622 because WebQuest's decision to post the content owned by Samson was "knowing and voluntary" and therefore constituted "active negligence" as opposed to a

---

[4] The trial court issued an amended tentative ruling which became the court's statement of decision ten days later. (Cal. Rules of Court, rule 3.1590(c)(4).)

passive failure to prevent a loss.  The court rejected that claim, explaining:  "*Assuming without deciding whether that legal contention could constitute a defense in the instant case, it is not supported by the evidence*."  (Italics added.)

The trial court acknowledged Seinfeld had testified he told Christian Amico of WebQuest "numerous" times Lupe Fuentes only had a verbal agreement with Samson to use the content and WebQuest's lawyers were going to look into the matter, but as the trial court also noted, Seinfeld's assertion was contradicted by the testimony of WebQuest's CEO and counsel as well as the documentary evidence.  Furthermore, because the take-down notice had already been received, any disagreement regarding responsibility would have been discussed during negotiations, and if the parties' (or Lupe Fuentes's) intent had been to exclude any claim for damages later brought by Samson, the contract logically would have said so; it did not.  In addition, the trial court found Lupe Fuentes's actions were inconsistent with any assertion Section 14.2 would not apply to any post-contract claim by Samson.  Lupe Fuentes never asserted a reservation of rights not to defend or indemnify WebQuest, accepting tender and providing a defense until Beitchman withdrew.

Regarding the issue of whether Seinfeld should be held personally liable, the trial court noted WebQuest had summarized "the plethora of facts" supporting its alter ego allegations in its trial brief, these facts were "amply supported by the evidence" and Lupe Fuentes made no attempt to controvert them.  Therefore, Seinfeld was personally liable as the alter ego of Lupe Fuentes.[5]  Accordingly, the trial court ordered judgment to be entered in favor of WebQuest and against Lupe Fuentes LLC, Lupe Fuentes and Evan

---

[5]     The parties stipulated Lupe Fuentes (Vergara) had signed the agreement in her individual capacity, and both she and Lupe Fuentes LLC were defined together as "Performer" in the Agreement.  The trial court found both had a duty to indemnify WebQuest as set forth in Section 14.2.

7

Seinfeld, jointly and severally, in the amount of $123,513.29, plus costs and attorneys' fees as allowed by law.[6]

Lupe Fuentes LLC, Lupe Fuentes aka Zuleydy Vergara and Evan Seinfeld appeal from the judgment subsequently entered.[7]

### *DISCUSSION*

### I. The Trial Court Did Not Err in Rejecting Lupe Fuentes's "Active Negligence" Argument.

Relying on *Rossmoor, supra,* 13 Cal.3d 622, Lupe Fuentes argues WebQuest is barred as a matter of law from recovery under section 14.2 of the Agreement because WebQuest "was 'actively negligent' in actively participating and acquiescing to the purported wrongful conduct giving rise to WebQuest's indemnity claim. . . ." We disagree.

### A. *Standard of Review.*

To the extent this appeal involves the interpretation of an indemnity agreement, we note that "[i]t is 'solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence.'" (*McCrary Construction Co. v. Metal Deck Specialists, Inc.* (2005) 133 Cal.App.4th 1528, 1535 (*McCrary*), citing *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) "Where the facts are undisputed, we review the trial court's application of law independently. [Citations.]

---

[6] WebQuest presented evidence that it paid $201,717.76 in attorneys' fees and settlement of the Samson litigation and that under the contract, it withheld $78,204.47 from payouts to Lupe Fuentes, resulting in a net loss of $123,513.29.

WebQuest had also alleged Lupe Fuentes breached the parties' agreement in October 2011 by "hijacking" the www.ilovelupe.com website and diverting WebQuest customers to a separate website it established. The trial court rejected that claim and found no need for an accounting. WebQuest did not cross-appeal and does not challenge the ruling in these respects.

[7] From this point forward, we include Seinfeld with Vergara (Fuentes) and Lupe Fuentes LLC in our further references to Lupe Fuentes unless otherwise indicated.

8

However, 'where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld.' [Citation.]" (*McCrary, supra,* 133 Cal.App.4th at p. 1535.)

In this case, the trial court's interpretation of the indemnity provision was based on its assessment of conflicting evidence regarding the parties' contract negotiations, their conduct before the dispute between them arose and facts underlying the Samson copyright claim. "Thus, in construing the indemnity agreement, 'to the extent the evidence is in conflict, we accept the trial court's implied credibility determinations; to the extent the evidence is not in conflict, we construe the instrument, and we resolve any conflicting inferences, ourselves. (*Parsons v. Bristol Development Co.*[, *supra*,] 62 Cal.2d [at pp.] 865–866 and 866, fn. 2.)' [Citation.]" (*McCrary, supra,* 133 Cal.App.4th at p. 1536; see also *Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 (*Sonic*) [under the substantial evidence test, all conflicts must be resolved in favor of the respondent].)

*B. Contract Interpretation, Indemnity and the* Rossmoor *Case.*

"Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 (*Wolf*), citing § 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . ."]; Civ. Code, § 1638 [the "language of a contract is to govern its interpretation . . ."].) "The court generally *may not consider extrinsic evidence* of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract." (*Wolf, supra,* 162 Cal.App.4th at p. 1126, citing Code Civ. Proc., § 1856, subd. (a), italics added, further citations omitted.) However, the parol evidence rule "does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in [Code of Civil Procedure] Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the

9

terms of the agreement, or to establish illegality or fraud." (Code Civ. Proc., § 1856, subd. (g).)

In *Rossmoor, supra,* 13 Cal.3d 622, the case on which Lupe Fuentes relies, our Supreme Court stated: "If an indemnity clause does not address itself to the issue of an indemnitee's negligence, it is referred to as a 'general' indemnity clause. [Citations.] While such clauses may be construed to provide indemnity for a loss resulting in part from an indemnitee's *passive* negligence, they will not be interpreted to provide indemnity if an indemnitee has been *actively* negligent." (*Rossmoor, supra,* 13 Cal.3d at p. 628, original italics.) The *Rossmoor* court also emphasized "we do not employ the active-passive dichotomy as wholly dispositive of this or any other case." (*Rossmoor, supra,* 13 Cal.3d at p. 632.) "[W]e hold that . . . the question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control. *When the parties knowingly bargain for the protection at issue, the protection should be afforded.* This requires an inquiry into the circumstances of the damage or injury and the language of the contract; of necessity, each case will turn on its own facts." (*Id.* at p. 633, italics added.)

*C. Substantial Evidence Supports the Trial Court's Determination WebQuest Was Not Actively Negligent and Was Entitled to Enforce the Contractual Indemnity Provision.*

Assuming without deciding that WebQuest was not entitled to indemnity under Section 14.2 of the Agreement if it had been "actively [negligent] as opposed to being passively negligent" as discussed in *Rossmoor, supra,* 13 Cal.3d 622, the trial court found the *evidence* did not support Lupe Fuentes's theory that WebQuest had been "actively negligent."

According to the record in this case, when Seinfeld provided the allegedly infringing content to WebQuest in April 2010, he told WebQuest's CEO (Lawson) to "[u]se this content to get the website started[;]" Seinfeld wanted the website "live" as soon as possible to capitalize on Fuentes's appearance on "Howard Stern," and "he

10

[Seinfeld] directed [WebQuest] to put the content up." On "numerous occasions," Seinfeld "assured [WebQuest] he had full rights to the content." According to Lawson's testimony, the Agreement was the parties' "way of formalizing that."

Consistent with this testimony, the parties stipulated the Agreement was effective as of April 1, 2010—when Seinfeld provided the allegedly infringing content WebQuest then posted.[8] Moreover, both WebQuest and Lupe Fuentes had already received Samson Investments' July 2010 take-down notice claiming Samson held the copyrights to the posted content when they negotiated the language of the Agreement. (Civ. Code, § 1636 [a contract must be interpreted so as to give effect to the mutual intention of the parties "as it existed at the time of contracting, so far as the same is ascertainable and lawful"]; Civ., Code, § 1647 ["A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"]; Code Civ. Proc., § 1860 ["For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the Judge be placed in the position of those whose language he is to interpret"].)

Under these circumstances, the parties contractually agreed that, unless WebQuest violated an "*explicit written instruction*" from Lupe Fuentes, all content Lupe Fuentes provided was expressly warranted *not* to violate any third party rights, including copyrights, and Lupe Fuentes was obligated to (1) "defend, at its own expense, any claim or action against WebQuest . . . based upon a claim that [Lupe Fuentes LLC, Lupe Fuentes] or any of [their] affiliates ha[ve] violated or infringed any right of any third party, or breached any warranty set forth in this Agreement" and (2) "indemnify and hold harmless WebQuest . . . from and against any and all damages, liabilities, losses and any

---

[8] In the Agreement itself, Lupe Fuentes (as "Performer") expressly agreed that: "Performer's obligation under this Section shall extend to all claims against WebQuest . . . *regardless of whether such claims were first asserted prior to the execution of this Agreement*." (Italics added.)

costs and expenses (including, but not limited to, attorneys' fees) incurred as a result of any such claim or action. . . ."[9] (Italics added.) Yet, Lupe Fuentes presented no evidence of any written instruction to WebQuest regarding the allegedly infringing content.

On this record, a trier of fact could reasonably conclude from the evidence presented that WebQuest was *not* "actively negligent"—just as the trial court found—because Seinfeld assured WebQuest Lupe Fuentes had full rights to the posted content when that was not the case. (*Rossmoor, supra,* 13 Cal.3d at p. 630.) More importantly, as the *Rossmoor* court emphasized, "while adhering to the underlying distinction between active and passive negligence . . . , we hold that . . . the question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control." Here, the parties expressly provided for indemnity for any claim of copyright infringement in the absence of a written instruction from Lupe Fuentes to WebQuest. (*Id.* at p. 633, citation omitted ["'Where, as in the present case, the circumstances of the claimed wrongful conduct dictate that damages resulting therefrom were intended to be dealt with in the agreement, there is no room for construction of the agreement. It speaks for itself.'. . ."].)

Furthermore, "Acts of the parties, subsequent to the execution of the contract and before any controversy has arisen as to its effect, may be looked to in determining the meaning. The conduct of the parties may be, in effect, a *practical construction* thereof, for they are probably least likely to be mistaken as to the intent. 'This rule of practical

---

[9]    In addition, the parties expressly acknowledged that Lupe Fuentes's "representations with respect to its indemnification of WebQuest hereunder constitute a material inducement to WebQuest's entering into this Agreement and that but for such indemnification, WebQuest would not enter into this Agreement." They further emphasized that, in the event of "any dispute or controversy . . . with respect to the interpretations of the scope of [Lupe Fuentes]'s indemnification of WebQuest, [Lupe Fuentes]'s indemnification obligations to WebQuest . . . *shall be interpreted liberally and expansively in WebQuest's favor to achieve maximum coverage and protection for WebQuest*." (Italics added.)

construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent." (1 Witkin, Summary of Cal. Law (10th ed. 2005) Subsequent Conduct of Parties, § 749, p. 838, citing *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 754, original italics, further citations omitted.)

Here, in email correspondence to WebQuest in August 2010 (after receipt of the take-down notice), Seinfeld referred to the Agreement as being drafted so that "ANY AND ALL 'RESPONSIBILITY' WILL BE TAKEN AWAY FROM W[EB]Q[UEST] AND TOWARDS US[.]" (Original emphasis.) Indeed, as of mid-August 2010, Seinfeld and Fuentes (Vergara) (through their attorney David Beitchman) expressly acknowledged their obligations to defend and indemnify WebQuest under Section 14.2 of the Agreement when they accepted WebQuest's tender of defense in the Samson action to Lupe Fuentes LLC and Lupe Fuentes without qualification. In an email to WebQuest officers and counsel (Mary Grant) seeking WebQuest's "findings and research" relating to Samson's claim, Seinfeld himself stated, "[W]e are indemnifying you and . . . we are entitled to know what kind of legal [sic] our money is paying for." It was only when Beitchman reportedly was no longer being paid and withdrew from the representation in May 2011 that Lupe Fuentes ceased to honor its stated obligation to defend and indemnify WebQuest as agreed. In this case, just as in *Rossmoor*, "It is a reasonable and practical conclusion that the parties bargained for the protection here at issue, given the language of the contract and the facts, as found by the trial court . . . ." (13 Cal.3d at p. 633.) Accordingly, WebQuest was entitled to the protection it sought under the indemnity provision of the Agreement. (*Ibid.* ["Since the accident may be seen as one of the risks against which Rossmoor sought to be covered, Rossmoor is entitled to the protection it seeks under the agreement"].)

13

Ignoring the evidence in support of the judgment as well as the standard of review, Lupe Fuentes argues Seinfeld's testimony established WebQuest was "actively negligent" because Seinfeld testified he told Christian Amico (a former WebQuest employee) Lupe Fuentes "might not have the rights to use any of the content [Seinfeld] provided." Not only was Seinfeld's testimony contradicted by WebQuest's CEO Ken Lawson (who testified Seinfeld assured him repeatedly he (Seinfeld) had "full rights" to the content on the hard drive he gave to WebQuest), but Lupe Fuentes went on to expressly "represent[] and warrant[]" in the Agreement that any content Lupe Fuentes provided WebQuest "will *not* infringe any third party rights"—specifically including any "copyrights"—so long as WebQuest was not in violation of any express *written* instruction from Lupe Fuentes, and Lupe Fuentes further agreed to defend and indemnify WebQuest against any claims to the contrary. (Italics added.) "Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may be not contradicted by evidence of a prior agreement or of a contemporaneous agreement."[10] (Code Civ. Proc., § 1856, subd. (a).)

Lupe Fuentes also relies on the allegations in Samson Investments' complaint that, for example, "[o]n information and belief, Seinfeld provided the stolen videos with the false copyright information to WebQuest, which copied, uploaded, displayed and distributed the stolen videos on www.ilovelupe.com."[11] Lupe Fuentes says WebQuest did not deliver the ilovelupe.com domain to Samson despite Samson's demand that WebQuest do so. Although he testified WebQuest "immediately" removed the allegedly infringing video content from the website, Ken Lawson testified that WebQuest

---

[10] Section 17.3 of the Agreement states: "This is the entire agreement of the parties. This Agreement cannot be amended except by a writing signed by both parties. . . ."

[11] According to the record, Samson initially believed Seinfeld must have "scrubbed" Samson's copyright information from the allegedly infringing video content, but it appears the content Seinfeld provided to WebQuest was "raw" footage which did not contain any indication of Samson's copyright.

contended "the term 'ilovelupe' did not infringe on any copyright.[12]  Leaving to one side the fact Samson's allegations on information and belief are not *evidence* of WebQuest's "active negligence," according to the record, Seinfeld had also assured WebQuest in an email that Lupe Fuentes "ha[d] the exclusive license to her IP that she owns" before the website went "live" and the content was posted in April 2010.  Again, in Section 12.2.4 of the Agreement, Lupe Fuentes represented and warranted that all "Performer Content, Performer name, and anything else provided by Performer, and WebQuest's possession and use of any of the foregoing, will not infringe any third party rights, including but not limited to copyrights . . . ."

In interpreting the indemnity provision of the parties' Agreement, the trial court assessed the evidence of the facts underlying the Samson action as well the evidence of the parties' negotiations and subsequent conduct.  On this record, Lupe Fuentes has failed to establish the trial court erred in rejecting the argument WebQuest was "actively negligent as a matter of law" and therefore not entitled to indemnity as specified in the Agreement.  (*Rossmoor, supra,* 13 Cal.3d at p. 633 ["It is a reasonable and practical conclusion that the parties bargained for the protection here at issue, given the language of the contract and the facts, as found by the trial court"]; *McCrary, supra,* 133 Cal.App.4th at p. 1536 ["to the extent the evidence is in conflict, we accept the trial court's implied credibility determinations; to the extent the evidence is not in conflict, we construe the instrument, and we resolve any conflicting inferences, ourselves"].)

## II. Substantial Evidence Supports the Trial Court's Determination Seinfeld Is Lupe Fuentes LLC's Alter Ego.

According to Lupe Fuentes, "WebQuest presented no evidence to support an alter ego finding against Seinfeld" as "Seinfeld's trial testimony concerning the LLC was

---

[12]    In fact, although Lupe Fuentes apparently conceded the video content WebQuest posted violated Samson's copyright, Lupe Fuentes fails to identify any evidence in the record indicating the term "ilovelupe" also infringed a copyright held by Samson.

15

benign."[13]  Therefore, because he did not execute the WebQuest Master Consulting Agreement, he cannot be held personally liable for any breach of the Agreement.  We disagree.

A. *Standard of Review*

"'[T]he conditions under which the corporate entity may be disregarded vary according to the circumstances in each case and the matter is particularly within the province of the trial court.  [Citations.]  This is because the determination of whether a corporation is an alter ego of an individual is ordinarily a question of fact.'  (*Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 46 [163 Cal. Rptr. 377].)  There are two requirements for disregarding the corporate entity: first, that there is a sufficient unity of interest and ownership between the corporation and the individual or organization controlling it that the separate personalities of the individual and the corporation no longer exist and, second, that treating the acts as those of the corporation alone will sanction a fraud, promote injustice, or cause an inequitable result.  (*Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 900 [88 Cal. Rptr. 2d 594].)  'Both of these requirements must be found to exist before the corporate existence will be disregarded, and since this determination is primarily one for the trial court and is not a question of law, the conclusion of the trier of fact will not be disturbed if it is supported by substantial evidence.'  (*Alexander v. Abbey of the Chimes, supra*, 104 Cal.App.3d at p. 47; see *NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 777 [256 Cal. Rptr. 441].)"  (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1071-1072 (*Misik*).)

B. *The Test for Determining Alter Ego Liability*

As explained in *Misik, supra,* 197 Cal.App.4th 1065, "The first requirement for disregarding the corporate entity under the alter ego doctrine—whether there is sufficient unity of interest and ownership that the separate personalities of the individual and the

---

[13]    Contrary to Lupe Fuentes's assertion, the parties stipulated to a number of facts relevant to this determination and further stipulated to the admission of several sets of discovery responses and Seinfeld's deposition in this regard.

corporation no longer exist—encompasses a series of factors. Among the many factors to be considered in applying the doctrine are one individual's ownership of all stock in a corporation; use of the same office or business location; commingling of funds and other assets of the individual and the corporation; an individual holding out that he is personally liable for debts of the corporation; identical directors and officers; failure to maintain minutes or adequate corporate records; disregard of corporate formalities; absence of corporate assets and inadequate capitalization; and the use of a corporation as a mere shell, instrumentality or conduit for the business of an individual. (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811–812 [110 Cal. Rptr. 3d 597].) This list of factors is not exhaustive, and these enumerated factors may be considered with others under the particular circumstances of each case. '"No single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine."' (*Id*. at p. 812.)" (*Misik, supra,* 197 Cal.App.4th at p. 1073.)

"The second requirement for application of the alter ego doctrine is a finding that the facts are such that adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice. (*Wood v. Elling Corp*. (1977) 20 Cal.3d 353, 365, fn. 9 [142 Cal. Rptr. 696, 572 P.2d 755].) The test for this requirement is that if the acts are treated as those of the corporation alone, it will produce an unjust or inequitable result. (*Mesler v. Bragg Management Co*. (1985) 39 Cal.3d 290, 300 [216 Cal. Rptr. 443, 702 P.2d 601].)" (*Misik, supra,* 197 Cal.App.4th at p. 1073.)

*C. Analysis*

Seinfeld testified Lupe Fuentes LLC was formed "around 2009[,]" and its sole purpose was to receive and distribute money from www.ilovelupe.com. He stipulated that he made all decisions for Lupe Fuentes LLC and controlled its bank accounts. Seinfeld (stipulated and) testified he was and had always been the sole owner of Lupe Fuentes LLC, and the company had no other members. It did not have meetings or keep minutes. It had no documents whatsoever to support Lupe Fuentes LLC's observance of corporate formalities. Seinfeld's home was the company's office. He used Lupe Fuentes

17

LLC's single employee to run personal errands for Fuentes and himself. At his deposition (lodged with the trial court and admitted into evidence), when he was asked a series of questions regarding Lupe Fuentes LLC, Seinfeld interjected: "We don't have regularly scheduled meetings. It's just me. I'm the company. I can save you some brain damage[.]"[14]

According to Seinfeld's testimony, he had invested $60,000 to $80,000 in Lupe Fuentes LLC over time, but he had no records of any such investment of capital. Seinfeld testified he did not take a regular salary from Lupe Fuentes LLC but withdrew money from its accounts. He also transferred money between Lupe Fuentes LLC accounts and his and Fuentes's joint personal accounts at the same bank (Chase) and did not keep separate records of funds transferred in and out of the accounts. According to exhibits admitted at trial, in mid-August 2010, Seinfeld pressed WebQuest for payment because he and Fuentes "NEED[ED]" that money "TO LIVE[.]" (Original emphasis.) In emails to Mike Van Loon (CFO and COO of WebQuest), Seinfeld wrote that "ANYTHING YOU CAN SEND THROUGH WOULD BE GREATLY APPRECIATED AND SPENT ON OUR DAY TO DAY LIVING EXPENSES." (Original emphasis.) In communications with WebQuest seeking payment, Seinfeld used personal pronouns in referring to finances. For example, in August 2010 correspondence, he complained to WebQuest "i [sic] wasted a ton of money on legal[,]" and in June 2011, he wrote "I [sic] am crippled by the nonpayment", "you are not paying me" and "apparently have no intention of paying me[.]" In an email to WebQuest in August 2010, Seinfeld represented "ANY AND ALL 'RESPONSIBILITY' WILL BE TAKEN AWAY FROM W[EB]Q[UEST] AND TOWARDS US." (Original emphasis.) When Beitchman

---

14     Seinfeld signed the Agreement with WebQuest as "CEO" of Lupe Fuentes LLC. However, he also stipulated at trial that *he* ("Evan Seinfeld") entered into the WebQuest Master Consulting Agreement—along with and in addition to Vergara and Lupe Fuentes LLC. Similarly, in his responses to WebQuest's requests for admission (admitted as evidence at trial), Seinfeld admitted that *he* entered into the Agreement (without any qualification that he had done so on behalf of Lupe Fuentes LLC only).

18

withdrew, saying he was no longer being paid, however, Lupe Fuentes stopped providing for WebQuest's defense and indemnification.

Based on the foregoing, the trial court was presented with evidence of numerous factors set out in *Misik, supra,* 197 Cal.App.4th 1073, supporting the conclusion Seinfeld was the alter ego of Lupe Fuentes LLC, including but not limited to the absence of any documentary evidence whatsoever to support the observance of any corporate formalities for Lupe Fuentes LLC, the adequate capitalization of the corporation at any time or any accounting for the acknowledged withdrawals of funds from the corporate account for personal spending as well as transfers between the corporate and personal accounts. Indeed, Seinfeld's own testimony and correspondence established he commingled his (and Vergara's) personal funds with those of Lupe Fuentes LLC, he failed to adequately capitalize the company, he failed to maintain any corporate records, he disregarded all corporate formalities and he held himself out as the corporation. (*Id.*) On this record, substantial evidence supports the conclusion Seinfeld "use[d Lupe Fuentes LLC] as a mere shell, instrumentality or conduit" for the business he conducted as an individual such that the trial court could conclude there was sufficient unity of interest and ownership that the separate personalities of the individual and the corporation did not exist. (*Misik, supra,* 197 Cal.App.4th at p. 1073, citation omitted.)

Similarly, given the evidence Seinfeld had misled WebQuest to believe Lupe Fuentes had the exclusive rights to the content WebQuest posted online when instead Samson held copyrights to the material and also represented "ANY AND ALL 'RESPONSIBILITY' WILL BE TAKEN AWAY FROM W[EB]Q[UEST] AND TOWARDS US" when the corporation was inadequately capitalized to meet its obligations, the trial court could reasonably conclude that if Seinfeld's actions were treated as those of the corporation alone, it would produce an unjust or inequitable result. (*Misik, supra,* 197 Cal.App.4th at p. 1073; *Automotriz del Golfo del California S.A. de C.V. v. Resnick* (1957) 47 Cal.2d 792, 797 (*Automotriz*), citation omitted ["'The attempt to do corporate business without providing any sufficient basis of financial responsibility

to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. . . . If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege'"]).) As substantial evidence supports the trial court's decision to find Seinfeld personally liable for his actions purportedly on behalf of Lupe Fuentes LLC, we find no error. (*Misik, supra,* 197 Cal.App.4th at p. 1072; *Automotriz, supra,* 47 Cal.2d at pp. 797-798 [although defendants testified the sum of $5,000 became a part of the capital of the corporation, the trial court was not compelled to accept that testimony as true; moreover, the court could have inferred the sum was insufficient capital investment in view of the business conducted; "it is proper to disregard corporate existence 'where . . . the device adopted is . . . an attempt to avoid liability for benefits enjoyed by means of taking the obligation in the name of a specially organized corporation which has no assets'"].)

For the reasons explained in *Misik, supra,* 197 Cal.App.4th at pages 1074-1075, we reject Lupe Fuentes's unsubstantiated assertion the alter ego allegations of WebQuest's complaint were insufficient to maintain this theory of liability against Seinfeld for failure to include the words "sanction a fraud or promote an injustice." In seeking to hold Seinfeld accountable as Lupe Fuentes LLC's alter ego, WebQuest alleged "Seinfeld has failed to observe corporate formalities, operates L[upe ]F[uentes ]LLC in an under-capitalized manner, and uses the corporation as his own private piggy-bank to pay for personal items such as rent for his residence. As such, there is no separation of identity between Seinfeld and L[upe ]F[uentes ]LLC, and Seinfeld is liable for the conduct of L[upe ]F[uentes ]LLC." No more was required. As we have already explained, WebQuest presented *evidence* satisfying both elements of the test for finding Seinfeld to be the alter ego of Lupe Fuentes LLC. (*Misik, supra,* 197 Cal.App.4th at pp. 1072-1073.)

20

### *DISPOSITION*

The judgment is affirmed.  WebQuest is to recover its costs on appeal.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                    **ZELON, J.**

21